*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-BG-762

IN RE DORRANCE DICKENS, RESPONDENT,

and

IN RE DEBORAH LUXENBERG, RESPONDENT.

**12/7/2017**
FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

(Bar Registration Nos. 450751 and 215657)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN-271-11, BDN-10-12, BDN-11-12, and BDN-272-11)

(Argued April 25, 2017                    Decided December 7, 2017)

*Richard J. Berwanger, Jr.*, with whom *Edward J. Hutchins, Jr.*, was on the brief, for Respondent Luxenberg.

*Julia L. Porter*, Senior Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the brief was filed, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before GLICKMAN and FISHER, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*:  This attorney disciplinary case involves the main

partner in a small law firm, respondent Deborah Luxenberg, and an attorney,

respondent Dorrance Dickens, who started at the firm as a law clerk but became an

associate and eventually a partner. Disciplinary Counsel[1] charged Ms. Luxenberg with several violations of the District of Columbia Rules of Professional Conduct after Mr. Dickens allegedly stole at least $1,434,298.50 from three estates, including that of Ms. Luxenberg's client, Michelle Seltzer. Following his theft, Mr. Dickens fled to an island outside of the United States.

The Board on Professional Responsibility ("the Board") has recommended that Mr. Dickens be disbarred from the practice of law due to his violation of multiple rules of professional conduct, including Rule 1.15 (a) and (c), commingling and misappropriation, and Rule 8.4 (c), conduct involving dishonesty, fraud, deceit, or misrepresentation.[2] The Board also has recommended

---

[1] When this case began, "Disciplinary Counsel" was known as "Bar Counsel," but the name later changed. For convenience, we use "Disciplinary Counsel" throughout this opinion.

[2] Mr. Dickens did not respond to Disciplinary Counsel's charges, take exception to the Board's Report and Recommendation, or file an appellate brief. The factual summary section of this opinion includes facts pertinent to the cases of both Mr. Dickens and Ms. Luxenberg. However, since Mr. Dickens did not participate in the disciplinary proceedings, and did not contest the Hearing Committee's and the Board's findings and conclusions, the analysis section of this opinion focuses only on arguments presented by Ms. Luxenberg. Furthermore, since Mr. Dickens has not contested the case against him, we conclude that Disciplinary Counsel has proven by clear and convincing evidence that he violated Rules 1.1 (a), 1.1 (b), 1.3 (b)(1) and (b)(2), 1.4 (a) and (b), 1.7 (b)(4), 1.15 (a) and (c), 8.1 (b), and 8.4 (b), (c), and (d) in the Harris, O'Brien, and Seltzer matters, and

(continued…)

that Ms. Luxenberg be suspended from the practice of law for six months due to her violation of Rules 1.3 (a), 5.1 (a), and 5.1 (c)(2), relating to the responsibility of partners in law firms to ensure competency and ethical behavior by attorneys in the firm.

Ms. Luxenberg argues on appeal that the Board erred by (1) considering evidence from disciplinary matters to which she was not a party; (2) finding that she violated Rules 1.3 (a), 5.1 (a), and 5.1 (c); and (3) recommending a "harsh" sanction that is inconsistent with this court's case law and that is greater than the 45-day sanction recommended by the Board's Hearing Committee. Disciplinary Counsel argues that the Board erred by failing to find that Ms. Luxenberg also violated Rules 1.3 (b)(1) and (2) pertaining to (a) a lawyer's intentional failure to seek the lawful objectives of a client and (b) prejudice or damage to the client; Rule 1.7 (b)(4) concerning a lawyer's representation of a client where the lawyer's professional judgment may be affected by her own interest; and Rule 8.4 (a) regarding a lawyer's professional misconduct by knowingly assisting or inducing

---

 (…continued)
he is hereby disbarred from the practice of law in the District of Columbia, and as a condition of reinstatement he is required to make restitution in the amount of $1,434,298.50, with interest at the legal rate.

another to violate or attempt to violate the Rules of Professional Conduct. Disciplinary Counsel also asserts that given the record in this case, the proper sanction for Ms. Luxenberg is a one-year suspension, with a fitness requirement.

For the reasons stated below, we accept the recommendation of the Board.

## FACTUAL SUMMARY

The findings of fact contained in the voluminous Report and Recommendation of the Board's Hearing Committee Number 12, and supporting record evidentiary documents, reveal the following factual context. Ms. Luxenberg commenced her practice of law as a member of the District of Columbia Bar in 1975. Eventually she was joined in practice by her husband, Stephen Johnson. While Mr. Dickens was completing his legal studies, he became a law clerk at the firm; he was hired in October 1995 because of his computer skills. His status changed to that of an associate in the firm in October 1996 when he became a member of the District of Columbia Bar.

In 1998, the firm incorporated in Maryland as Luxenberg and Johnson, and in 2003, when Mr. Dickens became a partner, the firm changed its name to Luxenberg, Johnson and Dickens. The firm had no partnership agreement but Ms. Luxenberg always retained a 52% interest in the firm. Ms. Luxenberg's practice has been devoted to family matters such as divorce and custody. Although she has never been the managing partner of the firm, she decided which clients the firm would represent and who would handle the client matters. Mr. Johnson also had a family law practice, and he took on cases in other areas of the law.

Mr. Dickens handled some cases with Ms. Luxenberg and some with Mr. Johnson, but also took on cases on his own, such as the representation, beginning in 2000, of Vernon Harris in the probate of Mr. Harris's sister's estate, and the representation of the personal representative of the estate of Dr. JoAnne S. O'Brien in April 2008 (the "Garrity/O'Brien" matter). There was a different arrangement in the case of Ms. Seltzer whose separation and divorce Ms. Luxenberg had handled in 1994. When Ms. Seltzer sought Ms. Luxenberg's representation in 2004 to update her estate plan, which included a revocable trust created in 1990 (the "1990 trust"), Ms. Luxenberg explained to Ms. Seltzer that she did not do that type of legal work; however, during a meeting at the law firm, Ms. Luxenberg

introduced Ms. Seltzer to Mr. Dickens as the person who could do the required work. Mr. Dickens made a few amendments in 2004 to the 1990 trust, and he prepared a general power of attorney as well as a healthcare power of attorney for Ms. Seltzer. In response to Ms. Seltzer's request, Ms. Luxenberg became a co-trustee of the trust; Ms. Seltzer remained as the other co-trustee. In mid-November 2004, Ms. Seltzer executed the amended trust as grantor and trustee, and Ms. Luxenberg signed the document as trustee.

In early 2007, Ms. Luxenberg and Mr. Johnson decided to move the main office of the firm from the District of Columbia to Maryland, and to maintain satellite offices in the District and Virginia. By this time Mr. Johnson's law practice was limited and his time centered on administration of the firm. Even though he was not a member of the Virginia Bar and Ms. Luxenberg had knowledge of that fact, Mr. Dickens worked out of the Virginia office that the firm leased in February 2007; the lease was signed by Mr. Dickens but the firm paid the rent for several months before delegating that responsibility to Mr. Dickens.

The management of the small firm was not rigorous after the 2007 move of the main office to Maryland and Mr. Dickens' relocation to the Virginia office.

Although the firm appears to have some policies and procedures to ensure compliance with ethical obligations, these were either loosely followed or not enforced with respect to matters handled by Mr. Dickens. Generally, the firm held biweekly staff meetings during which open cases were reviewed; however, Mr. Dickens' attendance at these meetings decreased significantly, his participation by phone was sporadic, and there were occasions on which he simply could not be reached. Moreover, despite the firm's record-keeping policies, Mr. Dickens failed to execute retainer agreements with clients that he represented, maintain proper billing records, and save electronic client documents to the firm's computer server. Even when the firm discovered that Mr. Dickens had clients for whom the main office had no records, or when the firm received checks, sometimes for substantial amounts of money, without documentation – as in the Garrity/O'Brien matter – the firm made little or no effort to ensure that Mr. Dickens followed its policies and procedures, as well as the ethical rules of the legal profession.

There was limited contact between Ms. Seltzer and the Luxenberg firm in 2006 and 2007 regarding her trust. In late 2007, Ms. Seltzer was diagnosed with Stage IV colon cancer. She underwent surgery, followed by chemotherapy treatment which she received through 2009. During that period of time, in addition

to Ms. Luxenberg's role as co-trustee of Ms. Seltzer's trust, Ms. Seltzer and Ms. Luxenberg became friends.

Sometime in early 2009, Mr. Dickens advised Ms. Luxenberg that he planned to leave the firm to spend time on other interests, but that he could still handle some legal matters; he traveled quite a bit, apparently in connection with a Middle East telecommunications venture and also business at the Vatican. Around April 2009, Ms. Seltzer contacted Ms. Luxenberg because she desired some changes in her estate plan, to ensure that she properly provided for her adult children, Eric Seltzer and Jerri Seltzer Falk. She stated in an email on May 11 that if Ms. Luxenberg was too busy to handle her request and would like for Mr. Dickens to do so, that would be "okay." On the same day, Ms. Luxenberg responded that Mr. Dickens "would have to deal with any trust questions." Thereafter, Ms. Luxenberg sent Mr. Dickens an email detailing information about Ms. Seltzer's children and the family trusts; she ended the email by saying, in part, "I have told Michelle [Ms. Seltzer] I will still be involved and will talk to her and if necessary do conference calls with her and you." In addition, Ms. Luxenberg informed Ms. Seltzer that the firm would charge a discounted hourly rate of $375 "because of our long relationship with you."

When she had not heard from Mr. Dickens, Ms. Seltzer sent emails to Ms. Luxenberg on July 6, and again on August 10, about the lack of communication from Mr. Dickens. On August 12, 2009, Ms. Luxenberg sent an email to Mr. Dickens, saying "I need to know if you can do this realistically. Otherwise we need to get someone else to do it." Mr. Dickens sent Ms. Seltzer a responsive communication and Ms. Luxenberg arranged for Ms. Seltzer and Mr. Dickens to speak by phone on a certain date. After speaking with Ms. Seltzer on August 18, 2009, Mr. Dickens sent an email to Ms. Luxenberg outlining the work to be performed on the trust and other documents, and he included mention of "[a] new trust" for Ms. Seltzer.

Because Ms. Seltzer had not received any draft documents from Mr. Dickens and had learned that her cancer had "metastasized and spread," she again reached out to Ms. Luxenberg on September 14, 2009, saying in part: "If this is an undertaking that [Mr. Dickens] is not interested in doing, I understand and perhaps I should find someone else. I do put my trust in both of you and that is why I felt you and [Mr. Dickens] could help me." Mr. Dickens claimed he had sent the documents by regular mail, then said he spelled the name of Ms. Seltzer's street

incorrectly, and subsequently, he sent a package to Ms. Seltzer by FedEx on September 16, which she received. Ms. Luxenberg and Mr. Dickens apparently had a tense telephone conversation during which Ms. Luxenberg requested copies of the Seltzer documents for the firm's central files; Mr. Dickens apparently took offense at the tone and content of the conversation. By September 21, 2009, it became clear that the only document Mr. Dickens had sent to Ms. Seltzer at that point was the new trust, which he discussed directly with Ms. Seltzer on September 21. Both Ms. Seltzer and Mr. Dickens informed Ms. Luxenberg on September 22 and 23, that they were making progress on the trust. Later, Ms. Seltzer's son (undoubtedly at the request of his mother) sent Mr. Dickens a list of Ms. Seltzer's assets, including account numbers.

Sometime thereafter, Mr. Dickens traveled to Rome. Upon his return, he sent Ms. Seltzer an email on October 20, 2009, acknowledging her calls and questions while he was away, the potential need for some changes in the trust, and the need to schedule a date for signing the trust. Between October 20 and October 26, Mr. Dickens and Ms. Seltzer exchanged emails regarding a date for the signing of the new trust. Although Eric and Jerri were included in the email exchange, Ms. Luxenberg was not, except for an October "FYI" email to her from Mr. Dickens on

October 26, which included the chain of emails beginning on October 20. On the day of the signing of the new trust, November 2, 2009, Mr. Dickens met with Ms. Seltzer, Eric, and Jerri in the Luxenberg firm's Maryland office. Mr. Dickens did not provide a copy of the new trust, labeled the "Michelle S. Seltzer Family Trust," to Ms. Seltzer's children before the meeting, and the schedule of Ms. Seltzer's assets was neither attached to the document she signed nor discussed during the meeting. Ms. Luxenberg did not see Ms. Seltzer or her children until the meeting had concluded; she claimed she did not know about the meeting or the signing.

One month after the execution of the new trust, Ms. Seltzer sent Mr. Dickens an email inquiring about her will, and advising that she wanted to complete everything before going to Johns Hopkins for further treatment. She followed that email with another on December 4 stating, "if you still have any documents to complete could we take care of that now?" Subsequently, on December 11, 2009, Ms. Seltzer signed her new will, which essentially mirrored her old will, except that Mr. Dickens was appointed as personal representative of her will; the will named Stephen Johnson as Mr. Dickens' successor. The will was witnessed by a non-lawyer employee of the firm, Stephen Gleichman, and by Billy Tollar, Mr. Dickens' friend who later became his spouse. Apparently Ms. Luxenberg did not

see the new will before it was presented to Ms. Seltzer, but Ms. Luxenberg was copied on a December 8, 2009, email that scheduled the will signing for December 11.

On December 23, 2009, Mr. Dickens was supposed to meet Ms. Seltzer at her bank, but did not appear. Ms. Luxenberg sent an apologetic email to Ms. Seltzer the following day stating that Mr. Dickens "went away for Christmas." But Mr. Gleichman had earlier informed Ms. Seltzer that Mr. Dickens was "unfortunately stuck in court for a vicious case," as the reason for his failure to keep the bank appointment with Ms. Seltzer; Ms. Luxenberg reiterated that reason in a later communication to Ms. Seltzer. In response to Ms. Luxenberg's email, Ms. Seltzer discussed her cancer treatments, and stated, "I'm sorry [Mr. Dickens] didn't relay where and why we were meeting since it wasn't extremely urgent. If he still wants to introduce himself to the officers of my bank, we'll have to do it after the first [of the year]."

In late January and early February 2010, Mr. Dickens filed an application for an IRS EIN number for the new Michelle Seltzer trust; the information he sent to the IRS identified himself as "Grantor" and "Trustee" of the trust. He also notified

Ms. Luxenberg about a change in his cellular service "[i]n preparation for my move to Italy," and he received confirmation from the State Corporation Commission for the Commonwealth of Virginia that articles of incorporation for the limited liability corporation, JECRAL, LLC had been filed successfully. Earlier on December 11, 2009, (according to Mr. Dickens' First Account for the Seltzer Family Trust, filed on March 25, 2011), Ms. Seltzer had purchased an Assignment of a 1% interest in JECRAL and FRW Telecom with a demand note payable to Mr. Dickens in his individual capacity in the amount of $685,000.

Ms. Seltzer's condition continued to deteriorate, and her daughter notified Mr. Dickens on February 14, 2010, that Ms. Seltzer had been placed in hospice care at Casey House in Maryland. Ms. Luxenberg bought several plants and went to see Ms. Seltzer on February 23. Until Ms. Luxenberg encountered Mr. Dickens in the parking lot of Casey House, she was unaware that Mr. Dickens planned to visit Ms. Seltzer on the same day to obtain her signature on a legal document. When Ms. Luxenberg arrived in Ms. Seltzer's room, Ms. Seltzer asked her to witness papers that Mr. Dickens had brought for Ms. Seltzer's signature. Ms. Luxenberg did not read the document she was asked to witness but she understood that it pertained to "marshall[ing] assets for the trust for Michelle Seltzer . . . that

were left in the PNC Bank." Ms. Luxenberg did not recall Mr. Dickens reading or explaining the document to Ms. Seltzer; nor did Ms. Luxenberg question Mr. Dickens about the document which stated: "To Any and All Officers of PNC Bank[,] Please cash-in or liquidate all of the Certificates of Deposit that I have in your bank, including, but not limited to all those listed on the attached two sheets and give the proceeds to Dorrance D. Dickens, who is my attorney." Ms. Luxenberg did not see "the two attached sheets" because they were not affixed to the document that Ms. Seltzer signed. The other person who witnessed the document was Carolyn Hohlfeld, then a human resources employee with Montgomery County government who had assisted Ms. Seltzer while she was still working and receiving cancer treatments. She happened to be visiting with Ms. Seltzer on February 23 and Mr. Dickens asked her to witness a document. Like Ms. Luxenberg, Ms. Hohlfeld did not read the document and did not recall seeing any attachments, but Ms. Hohlfeld questioned Ms. Seltzer to be sure Ms. Seltzer was aware of the nature of the document she was about to sign.

Armed with the February 23 document, Mr. Dickens proceeded to the PNC Bank on February 26, 2010, and transferred Ms. Seltzer's PNC assets to another PNC account for which he was the sole signatory, the "Michelle Seltzer Family

TRT, Dorrance D. Dickens Trustee" account. He deposited $20,000 of the funds into his personal account at another bank, the United Bank, on February 26, 2010. A few days later, on March 5, Ms. Seltzer succumbed to her illness. Mr. Dickens removed a total of $60,000 from Ms. Seltzer's trust funds from two checks written on March 8 and 11; he again deposited the funds in his personal account at United Bank. He also wrote a check to the Luxenberg firm on the Seltzer trust account on March 11, in the amount of $4,478 indicating on the memo line of the check "Legal Fees." The firm's bookkeeper posed an email question to Mr. Dickens about the missing bill that would explain the check; Mr. Dickens' return explanation was limited to, "[A]s soon as I decompress I will log on and handle it." Nevertheless, the firm cashed the check without any record confirming that it was entitled to funds from Ms. Seltzer's trust, a fact that Ms. Luxenberg acknowledged during her testimony before the Board.

Not long after Ms. Seltzer's memorial service on March 11, her children, Eric Seltzer and Jerri Seltzer Falk, communicated with Mr. Dickens by phone and email to inquire whether he was ready to meet with them about their mother's estate, but he "kept putting [them] off." Eventually, on March 23, 2010, he notified the Seltzer children that he had been "traveling outside the country" but

had returned; however, he did not indicate when he would meet with Mr. Seltzer and Ms. Falk. When Ms. Falk's April 1 email to Mr. Dickens, inquiring as to when they might meet "to discuss [the] will and other details," received no response, Stuart Plotnick, the trustee of the trust created for Eric Seltzer by his father, called and requested Ms. Seltzer's will and trust. A paralegal at the Luxenberg firm reported the call by email to both Mr. Dickens and Ms. Luxenberg on April 15, 2010.[3] Mr. Seltzer informed Mr. Dickens on April 19 that he still had not received the requested documents. Finally, on April 20, the firm's paralegal sent the trust without the statement of assets, but not the will, to Mr. Plotnick. Mr. Plotnick immediately asked about the schedule of assets and Mr. Dickens responded via email, with a copy to Ms. Luxenberg, that he did not yet have a schedule of assets since "[m]ost of the assets will be coming from the estate per the will." Mr. Dickens sent another email to Mr. Plotnick on April 21, with a copy to Ms. Luxenberg saying, in part, that he was "in the process of going through the papers to locate the assets" and mentioning the assets of "a revocable trust" as well as the irrevocable family trust that he had created for Ms. Seltzer. After Ms. Falk pressed the issue of Mr. Dickens' non-response in an email dated April 23, Mr.

---

[3] Ms. Luxenberg billed Ms. Seltzer's account for a trip to PNC Bank on April 16, 2010, with Mr. Dickens to transfer assets from the 1990 trust.

Dickens sent her a check and cash around April 26 to cover Ms. Seltzer's funeral expenses and honorarium for the rabbi who officiated at Ms. Seltzer's memorial service. It was in April and again in July 2010 that Ms. Luxenberg went to the PNC Bank with Mr. Dickens to transfer assets belonging to the 1990 trust to the 2009 trust.[4] Ms. Luxenberg billed Ms. Seltzer's account for the second trip to PNC Bank with Mr. Dickens on July 13, 2010. As Trustee of Ms. Seltzer's amended 1990 trust and in accordance with Mr. Dickens' direction, she transferred

---

[4] While he was avoiding sending documents to or meeting with Mr. Seltzer, Ms. Falk, and Mr. Plotnick, Mr. Dickens continued to siphon funds from Ms. Seltzer's family trust to benefit his personal account at United Bank, including $30,000 on March 12, $70,000 on March 23, and $35,000 on April 2, 2010. Mr. Seltzer and Ms. Falk continued to seek a meeting with Mr. Dickens, as well as a list of assets, and proceeds from the trust in May and June 2010. In addition, Ms. Luxenberg attempted to reach Mr. Dickens by phone in late June after Mr. Johnson indicated that there was "an immediate deadline" regarding the Seltzer matter. Ms. Luxenberg sent Mr. Dickens a follow-up email on June 23, 2010, asking "when the deadline is or what [she] h[ad] to do," and closing the email with "we need to get Seltzer done and I need to know what you want me to do." In the face of these requests for information Mr. Dickens removed more funds from the trust and placed them into his personal account including, $12,300 on May 10, 2010, $7,500 on May 26, $15,000 on June 10, and $10,000 on June 24. He transferred another $50,000 to James Frelk on June 7; Mr. Frelk was not a beneficiary of Ms. Seltzer's trust or will and was not connected to Ms. Seltzer. He dipped into the Seltzer trust again in July 2010, taking $3,500 on July 8, and paying $43,719.05 to Tysons Audi on July 14 for a car that he and Mr. Tollar co-purchased. By that time, he had lifted approximately $360,000 from the trust, leaving only about $200 as the balance at the end of July. He failed to properly deposit a $25,035.59 benefits payment from Montgomery County to the Seltzer trust, instead depositing it in his personal account on July 20, 2010.

$27,742.12 from the Michelle S. Seltzer Trust funds at the bank to the Michelle Seltzer Family Trust, although she thought the funds were being transferred to "the irrevocable trust." On the same day she transferred a smaller sum for a total of more than $33,000.

By early August 2010, Mr. Seltzer and Ms. Falk had not received the information they had requested from Mr. Dickens about the assets of the trust. Mr. Seltzer reported to his sister on August 2 that he had spoken with Mr. Dickens who said "he ha[d] run into complications with [Ms. Seltzer's] assets because [she] has two trusts." Mr. Seltzer added that Mr. Dickens "[s]ays he will know soon how much is in the estate and then I imagine [he] will also work on getting checks out to us that were promised at the end of last month." On August 9 Mr. Seltzer again pressed Mr. Dickens by asking for an accounting of the assets in the Seltzer trust set up by Mr. Dickens, requesting "copies of the first trust" as well as an accounting, and inquiring "where the assets are being kept (for example, where [his] half of [his mother's] life insurance proceeds are." Mr. Dickens sent an extensive response on August 10, outlining what purportedly were the steps he still had to take, promising to send Mr. Seltzer and Ms. Falk $5,000 each that day, and indicating that Ms. Luxenberg "is cooperating to get this done as efficiently as

possible." Ms. Falk sent a rapid response to Mr. Dickens, with a copy to Ms. Luxenberg, asserting in part that more important than a distribution was "a full and accurate accounting of the assets that are supposed to be in the trust." Shortly after receiving her copy of Ms. Falk's email, Ms. Luxenberg asked Mr. Dickens for "all of the documents in the Seltzer file," informed him that she had neither the trust documents nor the will, and reminded him that he had promised to submit the Seltzer file "a while ago when [he was] traveling the globe." Although Mr. Dickens sent Ms. Luxenberg some files, he did not transmit the schedule of assets or information about any of the trust bank accounts.[5]

---

[5] Between August and November 2010, when Mr. Seltzer, Ms. Falk, and Ms. Luxenberg were seeking information from him, Mr. Dickens began to collect and take for himself funds from Ms. Seltzer's estate that were earmarked for her 1990 trust. These included funds from T. Rowe Price investments - $10,000 taken on August 9, $42,000 on August 25, $15,000 on September 3, $10,000 on September 20, and $17,000 on September 28 for a total of $94,000; funds from Vanguard Mutual investments - $27,886 on October 8, $29,000 on October 15, $20,000 on November 10, $15,000 on November 18, (and later $29,985.86 on March 19, 2011), for a total of $121,871.86. In late November an attorney for Ms. Falk, Carole Gelfeld, tried to reach Mr. Dickens; after learning that he was reportedly ill, Ms. Gelfeld tried to reach Mr. Johnson, the successor trustee to the Seltzer family trust and successor personal representative for Ms. Seltzer's will. Mr. Johnson informed Ms. Luxenberg about the communication from Ms. Gelfeld. Ms. Luxenberg sent Mr. Johnson an email on November 30 stating "I can talk to [Mr. Dickens] about this. If you don't want to. Someone has to." Mr. Johnson in turn sent an email the same day to Mr. Dickens, with a copy to Ms. Luxenberg, stating in part "DDD: HELP!!!!!!!!!!! Please call her and me." Later that day, Ms. Luxenberg sent an email to Michelle DeLuca, President of the firm's Virginia

(continued…)

As the December 6, 2010, deadline approached for the filing of Ms. Seltzer's Maryland Estate Tax return, Ms. Gelfeld sent a formal letter to Mr. Dickens and Mr. Johnson expressing (1) concern that the estate might owe Maryland estate tax, and (2) concern not only about the absence of an accounting of estate and trust assets but also about the "[i]nability of Trustee to administer the Trust on a reasonable and timely basis." Ms. Luxenberg was aware of Ms. Gelfeld's letter through Mr. Johnson. Mr. Dickens sent an immediate defensive and partly dishonest response to Ms. Gelfeld claiming that he saw "no reason not to file the return by the deadline," denying that the Luxenberg firm had any "responsibility for anything under either the trust or estate," asserting that he had the responsibility and that Mr. Seltzer and Ms. Falk had "received a copy of the trust and Schedule A [listing Ms. Seltzer's assets] . . . on the morning Ms. Seltzer signed the trust agreement," declaring that Ms. Seltzer personally transferred her PNC bank assets to her new trust, insisting that he was "administering the Estate and Trust in a

---

(…continued)
lessor who provided administrative services to the firm. Mr. Johnson was copied on the email which stated, "We need to find out what to do in . . . [the] Seltzer" matter; Ms. Luxenberg also indicated that she did not "want to call [Mr. Dickens] and spring this on him." Ms. Luxenberg was aware that Mr. Dickens had had a heart attack.

reasonable and timely manner," and failing to mention that he had already pilfered a large chunk of Ms. Seltzer's assets. Mr. Dickens offered to meet with Ms. Gelfeld on the morning of December 15. On December 8, an associate in the office of Gary Altman, Mr. Seltzer's attorney, sent a letter to Mr. Dickens indicating that Mr. Altman could participate in the December 15 meeting by phone.[6]

As the new year dawned, Ms. Luxenberg became aware that Mr. Dickens had billed over $25,000 in personal expenses to a firm credit card that she thought had been closed out by Mr. Dickens after the firm had paid off $27,000 on the card in July 2007. Although Ms. Luxenberg had received calls from creditors about the credit card bill, she had hung up on the callers because she thought the card had been cancelled. Nevertheless, she began to communicate with Ms. DeLuca on January 5, 2011, asking her to get Mr. Dickens, who was facing heart surgery, to take care of the matter. Ms. Luxenberg explained during her hearing testimony

---

[6] Instead of a face-to-face meeting with Ms. Gelfeld, Mr. Dickens spoke with her and Mr. Altman by phone on December 15. Mr. Dickens claimed that he had filed the Maryland tax return on December 6 but acknowledged that he had not paid the tax that was due. Nor had he sent copies of the return to Ms. Gelfeld or Mr. Altman. Mr. Dickens agreed that modifications to the Seltzer family trust were required, and that he would step down as trustee in favor of an individual

(continued…)

that she was communicating with Ms. DeLuca instead of Mr. Dickens because "he wasn't returning her calls." However, Mr. Dickens sent a letter to Ms. Gelfeld and Mr. Altman on January 6, 2011, disclaiming that he had ever been asked to do an estate plan for Ms. Seltzer and asserting that had he done a plan for her he "would certainly [have] had a greater knowledge of her assets and their whereabouts and disposition than [he] actually did." He insisted that neither he nor Mr. Johnson had ever wanted to be a trustee of the trust or a personal representative of Ms. Seltzer's estate, and that after closing out the estate and the tax year, he would hand over the trusteeship. As the month of January drew to a close, Ms. Luxenberg was trying to locate Mr. Dickens through Ms. DeLuca on January 21 to wish him a happy birthday, while Ms. Gelfeld and Mr. Altman were writing to Mr. Dickens about serious problems they were discovering with his handling of Ms. Seltzer's assets and Mr. Dickens was trying to explain away their discoveries.

By February 1, 2011, Mr. Dickens agreed to accept the recommendation of Ms. Gelfeld and Mr. Altman that Peg Shaw, an attorney licensed in the District of Columbia, prepare a Seltzer trusts/estate accounting. As Ms. Shaw worked on the

---

(…continued)
acceptable to the beneficiaries of the trust.

estate accounting, she raised questions with Mr. Dickens about missing items such as Ms. Seltzer's pension funds, and Mr. Dickens sought to deflect the questions. Before Ms. Shaw completed the draft estate accounting on February 21, based on the information provided by Mr. Dickens, he had taken more money from Ms. Seltzer's assets - $3,184.40 on February 10, and $6,000 and $12,000 on February 14. As Ms. Shaw began working with Mr. Dickens, but not Ms. Luxenberg, on the trust accounting in early March, she sent Mr. Dickens an email on March 2, 2011, informing him that a page from the estate tax return – listing the assets relating to "Mortgages, Notes, and Cash" – was missing. On that same day Mr. Dickens took $25,000 from Ms. Seltzer's assets. The following day Ms. Shaw sent Mr. Dickens an email attaching the draft trust accounting and stating in part, "Please review the document called Missing Assets. This shows what I can account for and what I can't account for. We need to find the missing stuff."[7] Ms. Shaw sent a final draft accounting to Mr. Dickens on March 14 with an extensive email identifying problems, including "what happened to the approximately $300,000 in CD's

---

[7] On March 9, 2011, Ms. Shaw sent Mr. Dickens an email attaching a revised draft of the accounting and listing missing items, including those related to the T. Rowe Price and Vanguard Mutual investments; information about Ms. Seltzer's alleged purchase of an interest in FRW Telecom; and statements from the PNC trust account and the United Bank trust account.

owned by [Ms. Seltzer] until she liquidated them . . . a few days before her death."[8] On March 18, 2011, Ms. Shaw sent Mr. Dickens yet another email identifying missing items from the estate and trust accountings. That same day Mr. Dickens lifted $15,000 from Ms. Seltzer's assets, and on March 29, he took $29,985.86 in proceeds from the Vanguard Mutual investment.[9] Also on March 29, 2011, Mr. Dickens made a handwritten note on the $685,000 demand note that Ms. Seltzer had signed on December 11, 2009, stating "This note is hereby satisfied, cancelled, and released this 29th day of March, 2011."

Mr. Altman sounded the alarm on March 29, 2011, when he attempted to reach Ms. Luxenberg, Mr. Johnson, and Mr. Dickens by phone. He left a message

---

[8] Ms. Shaw sent another email to Mr. Dickens on March 17, 2011, attaching a revised draft of the accounting, indicating that she was "able to reconcile the Family Trust First Account" but raising a question about the retirement plan payment and advising Mr. Dickens that there was no disclosure of his "personal United Bank account where the retirement fund proceeds were deposited." The accounting contained a footnote regarding the Assignment of Interest purchased by Ms. Seltzer on December 11, 2009, and the use of over $300,000 from the PNC Bank accounts to pay part of the Demand Note.

[9] As of March 15, 2011, Ms. Luxenberg was aware of Mr. Dickens' decision to move to a Caribbean island; an email sent from Ms. Luxenberg to Ms. DeLuca stated that Mr. Johnson would call her to "discuss arrangements for continuing with [her] as a satellite office after [Mr. Dickens] leaves to go to St. Kitts."

saying it was "an absolute emergency." Ms. Luxenberg tried to reach Mr. Dickens through Ms. DeLuca.[10] Mr. Altman followed his call with a letter dated March 30, 2011, indicating that there should be approximately $1,485,842 in Ms. Seltzer's estate and demanding a distribution of $750,000 each to Ms. Seltzer's children, as well as Mr. Dickens' resignation, and that of Ms. Luxenberg, from their respective roles in Ms. Seltzer's estate and trust. Mr. Dickens sent letters to Ms. Gelfeld and Mr. Altman on April 7, April 19, 2011, and May 2, 2011, in an attempt to resolve the matter. He met with Mr. Altman and Ms. Gelfeld on April 27, admitted that his "telcom deal" had been worthless since around August 2010, defended the Demand Note that Ms. Seltzer had signed, and promised to close out the Seltzer estate before departing on May 6, 2011. On April 29, Mr. Dickens removed another $11,000 from Ms. Seltzer's trust, allegedly for "fees." Ms. Falk and Mr. Seltzer filed a multi-count lawsuit against Mr. Dickens, Ms. Luxenberg, and the Luxenberg firm on May 5, 2011. The parties settled and Ms. Falk and Mr. Seltzer dismissed the lawsuit against Ms. Luxenberg and the Luxenberg firm with

---

[10] In her email to Ms. DeLuca, Ms. Luxenberg reported that Mr. Altman's message said that she "had better call the malpractice carrier . . . and the State Bar" because of her role as a trustee, and that she had "conspired to steal money from the trust." Ms. Luxenberg reported that she did not "know anything about what has been happening in the case" and that she was "frightened" because of the threat of malpractice.

prejudice, and dismissed the action against Mr. Dickens without prejudice on August 16, 2012.[11] Disciplinary Counsel began its investigation of Ms. Luxenberg and Mr. Dickens in July 2011.[12]

Both Ms. Luxenberg and Disciplinary Counsel filed Briefs before the Hearing Committee supporting their respective exceptions to the Committee's Report and Recommendation, as well as oppositions to the other's Brief. In

---

[11] Ms. Gelfeld testified before the Board that Ms. Seltzer's estate originally had approximately $1.6 million, and was "left with well under $700,000" after Mr. Dickens' theft of Seltzer assets.

[12] After Disciplinary Counsel filed specification of charges against Mr. Dickens and Ms. Luxenberg, the Board's Hearing Committee Number Twelve conducted the proceedings against both attorneys. In response to Disciplinary Counsel's motion, to which neither Mr. Dickens nor Ms. Luxenberg filed a response, on November 27, 2013, the Board issued an order assigning Mr. Dickens' and Ms. Luxenberg's cases to the same hearing committee and *sua sponte* consolidated the specifications of charges in both cases. Subsequently, on February 14, 2014, the Hearing Committee issued an Order in which it stated, in part, that "[Ms.] Luxenberg is on notice that when considering the charges against her, the Hearing Committee may consider evidence presented in connection with [the Dickens' matters], as well as [the Luxenberg matters]." Nevertheless, the Hearing Committee stated in its conclusions of law relating to the Seltzer matter that "the Committee has considered against [Ms.] Luxenberg only the charges against her that are set forth in the Specification of Charges in which she is named." The Hearing Committee added, "to the extent that certain of those charges address [Ms.] Luxenberg's responsibility for [Mr.] Dickens' misconduct, the Committee has considered only whether she is responsible for [Mr.] Dickens' violations in the Seltzer matter, not whether she is responsible for [Mr.] Dickens' violations in the Harris or O'Brien matters."

addition, both Disciplinary Counsel and Ms. Luxenberg filed exceptions to the Board's Report and Recommendation, on August 16 and August 18, 2016, respectively. Mr. Dickens took no exception to the Board's Report and did not respond to this court's order to show cause why he should not be suspended; consequently, on October 3, 2016, this court suspended Mr. Dickens from the practice of law, pending the outcome of the disciplinary proceedings against him.

## STANDARD OF REVIEW

D.C. Bar Rule XI, § 9 (h)(1) provides that "the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record . . . ." *See also In re Downey*, 162 A.3d 162, 167 (D.C. 2017). However, we owe no deference to the Hearing Committee's or the Board's findings of ultimate fact or conclusions of law, which we review *de novo*. *In re Samad*, 51 A.3d 486, 495 (D.C. 2012). "The decision on sanction is committed, in the final analysis, to this Court's discretion." *In re Cater*, 887 A.2d 1, 12 (D.C. 2005) (citation omitted). "In exercising that discretion, our policy is to 'adopt the recommended disposition of the Board unless to do so would foster a tendency

toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *Id*. (citing D.C. Bar R. XI, § 9 (g)).

## ANALYSIS

**Did Ms. Luxenberg Violate Rules 1.3 (a), 1.3 (b)(1), and 1.3 (b)(2) of the Rules of Professional Conduct?**

Rule 1.3 of the District of Columbia Rules of Professional Conduct provides that:

> (a)    A lawyer shall represent a client zealously and diligently, within the bounds of the law.
>
> (b)    A lawyer shall not intentionally:
>
> > (1)    Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or
> > (2)    Prejudice or damage a client during the course of the professional relationship.
>
> (c)    A lawyer shall act with reasonable promptness in representing a client.

Ms. Luxenberg contends that "[t]he Board incorrectly concluded [that she] neglected Ms. Seltzer's trust and estate matters in violation of Rule 1.3 (a)." She argues that the Board "in essence" determined that she violated Rule 1.3 (b) rather than Rule 1.3 (a), and that the Board's conclusions are "based on findings that are unsupported by the record." Disciplinary Counsel argues that the Board correctly found that Ms. Luxenberg violated Rule 1.3 (a), and that the record also establishes a Rule 1.3 (b) violation because Ms. Luxenberg "knowingly and intentionally defaulted on her obligations to serve her client [Ms. Seltzer] in violation of Rules 1.3 (a), 1.3 (b)(1) and 1.3 (b)(2)."

Our analysis of the Rule 1.3 issue is guided by the following legal principles. Rule 1.3 (a) which mandates that "[a] lawyer shall represent a client zealously and diligently, within the bounds of law[,]" clearly requires the existence of an attorney/client relationship. The trier of fact determines whether an attorney-client relationship exists, *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982), and this court "consider[s] the totality of the circumstances to determine whether an attorney-client relationship exists," *In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (per curiam). "[N]either a written agreement nor the payment of fees is necessary to create an attorney-client relationship." *In re Lieber*, *supra*, 442 A.2d at 156.

"Furthermore, it is not necessary for an attorney to take substantive action and give legal advice in order to establish such a relationship." *Id.* "An attorney's ethical responsibilities exist independently of contractual rights and duties; consequently, the obligations imposed by the Rules arise from the establishment of a fiduciary relationship between the attorney and client." *In re Fay*, *supra*, 111 A.3d at 1030 (internal quotation marks and citation omitted).

"All that is required [to create an attorney-client relationship] is that the parties explicitly or by their conduct, manifest an intention to create the attorney[-]client relationship." *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996) (internal quotation marks and citation omitted). In that regard, "a client's perception of an attorney as his counsel is a consideration in determining whether a relationship exists." *In re Lieber*, *supra*, 442 A.2d at 156 (citation omitted). "Doubt about whether a client-lawyer relationship still exists should be eliminated by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so." District of Columbia Rules of Professional Conduct, Rule 1.3, Comment 9.

Once an attorney-client relationship is established, Rule 1.3 (a) requires the lawyer "to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations"; thus, "[a] lawyer should act with commitment and dedication to the interests of the client"; with the realization that "unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness"; and with awareness that a lawyer has an "obligation of diligence" with respect to client matters. District of Columbia Rules of Professional Conduct, Rule 1.3, Comments 1, 8; *see also In re Starnes*, 829 A.2d 488, 503 (D.C. 2003) (per curiam) (Rule 1.3 (a) is "directed at the lawyer's obligation of due diligence [and] zealous representation"). The words of Rule 1.3 (b)(1) and Rule 1.3 (b)(2) plainly require a finding of intentional conduct on the part of the lawyer. "Neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it." *In re Anderson*, 979 A.2d 1206, 1222 (D.C. 2009) (internal quotation marks and citation omitted).

Here, neither the Hearing Committee nor the Board explicitly addressed whether an attorney-client relationship generally existed between Ms. Luxenberg and Ms. Seltzer regarding the trusts and estates matter, although both briefly

addressed whether Ms. Luxenberg acted in a legal capacity when she witnessed Ms. Seltzer's signing of the letter of instruction in February 2010. Nevertheless, the Committee and Board disagreed as to whether Ms. Luxenberg violated Rule 1.3 (a) – the Committee determined that she did not, and the Board that she did violate Rule 1.3. On this record we first conclude that there was an attorney-client/fiduciary relationship between Ms. Luxenberg and Ms. Seltzer with respect to the trusts and estates matter. Second, we conclude that the record contains substantial evidence supporting the Board's conclusion that Ms. Luxenberg violated Rule 1.3 (a).

First, there is no doubt that Ms. Seltzer and Ms. Luxenberg had an attorney-client relationship, beginning in 1994 when Ms. Seltzer engaged Ms. Luxenberg to handle her divorce action. Later, Ms. Seltzer approached the Luxenberg firm in 2004 to update her estate plan, and although Ms. Luxenberg clearly informed Ms. Seltzer that she did not handle cases involving trusts and estates, she introduced Mr. Dickens, a partner in the firm, as a person who could do that type of work. Moreover, Ms. Luxenberg agreed to become a co-trustee of the 1990 Seltzer trust, replacing Ms. Seltzer's brother in that role. Again, in 2009 Ms. Seltzer requested Ms. Luxenberg's assistance to make additional changes to her estate plan.

Although Ms. Luxenberg clearly stated that Mr. Dickens "would have to deal with any trust questions," Ms. Luxenberg informed Mr. Dickens that she would "still be involved and [would] talk to [Ms. Seltzer] and if necessary do conference calls with her and you," manifesting an intention that both she and Mr. Dickens would have an attorney-client relationship with Ms. Seltzer. *See In re Ryan*, *supra*, 670 A.2d at 379. Because Mr. Dickens had not performed any work during an approximate three-month period, Ms. Seltzer suggested to Ms. Luxenberg that perhaps she should find someone else to do the necessary work. Significantly, Ms. Seltzer also stated in the same communication that she "put [her] trust in both [Ms. Luxenberg and Mr. Dickens] and that is why [she] felt that [Ms. Luxenberg and Mr. Dickens] could help [her]," clearly indicating Ms. Seltzer's perception that both Ms. Luxenberg and Mr. Dickens were her attorneys. *See In re Lieber*, *supra*, 442 A.2d at 156. Consequently, the record supports the existence of an attorney-client relationship between Ms. Luxenberg/Mr. Dickens and Ms. Seltzer regarding the trusts and estates matter.

Second, even though the Board and the Hearing Committee disagreed as to whether Ms. Luxenberg violated Rule 1.3 (a), our review of the record convinces

us that Ms. Luxenberg violated the duty of diligence that the Rule mandates.[13] Indeed, Comment 8 to the Rule emphasizes that "unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness," and the Rule also underscores the fact that "[n]eglect of client matters is a serious violation of the obligation of diligence." District of Columbia Rules of Professional Conduct, Rule 1.3, Comment 8; *see also In re Reback*, 487 A.2d 235, 238 (D.C. 1985) (neglect means "indifference and a consistent failure to carry out the obligations which the lawyer has assumed to [her] client or a conscious disregard for the responsibility owed to the client"). The duty or obligation of diligence was particularly compelling in this case because Ms. Seltzer had been battling a terminal illness since 2007 and both Ms. Luxenberg and Mr. Dickens were aware of the illness.

The record reveals Ms. Luxenberg's failure to recognize, at least by July 2009 that her longstanding trust in Mr. Dickens was not warranted, especially in the face of Ms. Seltzer's declining health and anxiousness to complete work on the documents reflecting her wishes to protect and provide for her adult children.

---

[13] We do not agree with Disciplinary Counsel's argument that the Board "in essence" decided that Ms. Luxenberg violated Rule 1.3 (b)(1) and Rule 1.3 (b)(2).

Although Ms. Luxenberg had become a seasoned lawyer with an admirable track record of service to her clients and the legal profession, her actions and omissions manifested a consistent failure to carry out her obligation of diligence to Ms. Seltzer. Ms. Luxenberg ignored clear warning signs that the trust and confidence Ms. Seltzer had placed in her and Mr. Dickens was no longer justified. The warning signs included (a) Mr. Dickens' long delay in addressing Ms. Seltzer's 2009 request for additional modifications of her trust and estate documents; (b) Mr. Dickens' frequent travels abroad while work on Ms. Seltzer's matter was pending, and his notice to the Luxenberg firm that he would be moving to Italy; (c) Mr. Dickens' failure to honor Ms. Luxenberg's September 2009 request that he submit copies of the Seltzer trusts and estate documents to the firm's central files; (d) Mr. Dickens' failure to notify Ms. Luxenberg about Ms. Seltzer's November 2009 visit to the Luxenberg firm's Maryland office to sign the Seltzer Family Trust agreement; (e) the delay in Mr. Dickens' transmittal of the redraft of the Seltzer will to the client; (f) Mr. Dickens' failure to meet Ms. Seltzer at the bank on December 23, 2009, as planned and Ms. Luxenberg's confusion as to the reason for his failure; and (g) Mr. Dickens' lack of notice to Ms. Luxenberg, a co-trustee of the 1990 amended trust, that he would seek Ms. Seltzer's signature, on February

23, 2010, on a letter of instruction regarding the transfer of assets from the 1990 amended trust to the Seltzer Family Trust created by Mr. Dickens.

The events surrounding the letter of instruction substantiated Ms. Luxenberg's consistent failure to carry out her obligation of diligence to her client, Ms. Seltzer. Notwithstanding Ms. Luxenberg's friendship with Ms. Seltzer, Ms. Luxenberg had an attorney-client, and hence, a fiduciary relationship with Ms. Seltzer. That relationship not only covered the legal work that Ms. Seltzer had requested in 2009 which had been unduly delayed, but also Ms. Luxenberg's fiduciary role as co-trustee of Ms. Seltzer's 1990 trust. Yet, Ms. Luxenberg had little idea about the content of the document – the letter of instruction – that Ms. Seltzer asked her to witness on February 23. Nevertheless, Ms. Luxenberg understood that the document concerned "marshall[ing] assets for the trust for [Ms.] Seltzer that were left in the PNC Bank." Even with this limited understanding, Ms. Luxenberg as co-trustee of Ms. Seltzer's 1990 trust did not bother to read the one sentence instruction to the officers of the PNC Bank, "[p]lease cash-in or liquidate all of the Certificates of Deposit that I have in your bank, including, but not limited to all those listed on the attached two sheets and give the proceeds to Dorrance D. Dickens, who is my attorney." Because she did

not read the one-sentence instruction, she of course did not realize that nothing was attached to the letter of instruction, and did not comprehend the significance of the missing schedule of Ms. Seltzer's assets. Ms. Luxenberg's failure to carry out her obligation of diligence to Ms. Seltzer under Rule 1.3 (a) left a clear path not only for Mr. Dickens to go to the PNC Bank on February 26 to transfer some of Ms. Seltzer's PNC assets to an account over which he had control, but also paved the way for Mr. Dickens to return to the bank in April and July 2010, with Ms. Luxenberg, to transfer assets from the amended 1990 trust to the 2009 trust, assets that Mr. Dickens began to transfer into his personal account.

Ms. Luxenberg's obligation of diligence and her fiduciary duty to Ms. Seltzer included not only reading the letter of instruction, but also obtaining and reading copies of the 1990 trust, the 2004 amendments, and the 2009 trust. As a result of reading these documents, Ms. Luxenberg would have been aware of important provisions of the documents and would have had a proper context for understanding the significance of the letter of instruction. She would have known at least the following. The beneficiaries of the 1990 trust were Ms. Seltzer's children, Mr. Seltzer and Ms. Falk, and the co-trustees were Ms. Seltzer and her brother, Charles Schaffer; Article 8 (A) of the 1990 trust specified that when one of

the co-trustees ceased to serve, the sole successor trustee could appoint a co-successor. Article 10 outlined the extensive fiduciary powers of the trustees. Under the 2004 Amended Michelle S. Seltzer Revocable Trust, Ms. Seltzer designated herself and Ms. Luxenberg as the co-trustees; Article 8 (B) provided that upon the death of either Ms. Seltzer or Ms. Luxenberg, "the other shall be the sole successor co-trustee" and could "appoint a corporate trustee or a child of the grantor, if over the age of 21, as a co-successor or successor trustee." The 2004 amendment did not alter Article 10 regarding fiduciary powers, including Article 10 (1) concerning the power to transfer investments and property of the trust. A reading of these documents also would have made Ms. Luxenberg cognizant of the fact that instead of again amending the 1990 trust in 2009, Mr. Dickens created a new trust, the Michelle S. Seltzer Family Trust. The trust document specified that that trust was between Ms. Seltzer as Grantor or Settlor and "Dorrance D. Dickens, trustee, of Luxenberg, Johnson, and Dickens, P.C." The new trust did not reference the 1990 trust, nor provide for the transfer of assets or the conveyance of legal title of the 1990 trust assets to the new trust, and the Schedule A of assets that was attached to the new trust, did not mention the assets of the 1990 trust. Mr. Dickens and Mr. Johnson were named as trustees of the new trust, and Ms. Seltzer and her children as beneficiaries. Since she had not read the trust documents even

though she was a co-trustee of the amended 1990 trust, Ms. Luxenberg was negligent in failing to determine her powers and duties under Article 8 (B) and Article 10 (1) of the 1990 amended trust, before witnessing the letter of instruction, and before accompanying Mr. Dickens to the PNC Bank for a transaction that resulted in the transfer of assets from the 1990 trust to the trust which Mr. Dickens had created, ostensibly for Ms. Seltzer, but actually to advance his own interests.[14] In short, the record contains substantial clear and convincing evidence supporting the Board's conclusion that Ms. Luxenberg violated Rule 1.3 (a).

Although we agree with the Board that Ms. Luxenberg violated Rule 1.3 (a), we conclude the record does not support by clear and convincing evidence Disciplinary Counsel's contention that Ms. Luxenberg also violated Rule 1.3 (b)(1) and Rule 1.3 (b)(2). Like the Hearing Committee and the Board, we see no substantial evidence in the record to support a finding that Ms. Luxenberg violated

---

[14] In light of our conclusion, we see no need to fully address the Board's acceptance of two other arguments initially presented by Disciplinary Counsel before the Hearing Committee and later restated by the Board – that Ms. Luxenberg violated Rule 1.3 (a), first by "delegat[ing] [Ms.] Seltzer's 2009 matter to [Mr.] Dickens while knowing that he was not licensed in Maryland, was rarely around, and already had made plans to leave the firm and practice of law," and second "[Ms.] Luxenberg neglected [Ms.] Seltzer's matter because she knew [Mr.] Dickens was not working on the Seltzer matter for four months, but took no actions

(continued…)

Rule 1.3 (b)(1) because she intentionally "[f]ail[ed] to seek the lawful objectives of [her] client[, Ms. Seltzer,] through reasonably available means permitted by law and the disciplinary rules," or Rule 1.3 (b)(2) because she intentionally "[p]rejudice[d] or damage[d] [Ms. Seltzer] during the course of the professional relationship." District of Columbia Rules of Professional Responsibility, Rules 1.3 (b)(1) and 1.3 (b)(2).

Rule 1.3 (b) does not "require proof of intent 'in the usual sense of the word.'" *In re Ukwu*, 926 A.2d 1106, 1116 (D.C. 2007). "Rather, neglect ripens into an intentional violation when the lawyer is aware of [her] neglect of the client matter; or put differently, when a lawyer's inaction coexists with an awareness of [her] obligations to [her] client." *Id.* (internal quotation marks and citations omitted). "[I]n assessing intent, the court must consider the entire context." *Id.* Here the record does not contain evidence of intentional or deliberate conduct or evidence showing that Ms. Luxenberg's inaction coexisted with her awareness of her obligations to Ms. Seltzer under the trust documents. For example, unlike the respondent in *In re Alexander*, 865 A.2d 541, 542 (D.C. 2005), who was found to

―――――――――――

(…continued)
to ensure that [Ms.] Seltzer was receiving proper representation."

have violated Rule 1.3 (b)(2), Ms. Luxenberg did not engage in fraudulent misappropriation or theft of client assets. Nor did she, unlike the respondent in *In re Mance*, 869 A.2d 339, 340 (D.C. 2005), fail to correct the problem after receiving formal notice that his client's appeal was untimely. In sum, we cannot agree with Disciplinary Counsel that Ms. Luxenberg violated Rules 1.3 (b)(1) and 1.3 (b)(2).

**Did Ms. Luxenberg violate Rules 5.1 (a), 5.1 (c)(2), 1.7 (b)(4), and 8.4 (a)?**

Rules 5.1 (a) and 5.1 (c)(2) provide in pertinent part:

> (a)    A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm . . ., shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm . . . conform to the Rules of Professional Conduct . . . .

> (c)    A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

>           . . . .

(2) The lawyer has direct supervisory authority over the other lawyer or is a partner or has comparable managerial authority in the law firm . . . in which the other lawyer practices, and knows or reasonably should know of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Rule 1.7 (b)(4) states in relevant part:

[A] lawyer shall not represent a client with respect to a matter if:

. . . .

(4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

Rule 8.4 (a) provides:

It is professional misconduct for a lawyer to:

(a)  [v]iolate or attempt to violate the Rules of professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another. . . .

With respect to Rule 5.1 (a) Ms. Luxenberg first contends that "Disciplinary Counsel failed to prove by clear and convincing evidence that [Ms.] Luxenberg had sufficient managerial authority within her [f]irm to place her in charge of

putting in place policies and procedures to ensure that [Mr.] Dickens, a named partner in the [f]irm, complied with the Rules of Professional Conduct."[15] Disciplinary Counsel supports the finding of the Hearing Committee and the Board that Rule 5.1 (a) applies to Ms. Luxenberg and that she violated that rule. Specifically, Disciplinary Counsel maintains that Ms. Luxenberg had managerial authority within the firm because "the Board noted [her] roles as founder, decision-

---

[15] As a threshold matter, Ms. Luxenberg insists that the Board violated her due process rights under D.C. Bar Rule XI, § 8 (c) by considering evidence introduced in the Harris and O'Brien matters, even though she was not charged in those matters. The Board acknowledged that the Hearing Committee considered evidence presented in the Harris, O'Brien, and Seltzer matters in examining whether Ms. Luxenberg violated Rules 5.1 (a) and 5.1 (c)(2) because the evidence involved the administration of the Luxenberg firm. Section 8 (c) states in part, that the petition initiating disciplinary proceedings "shall be sufficiently clear and specific to inform the attorney of the alleged misconduct." In its order of February 14, 2014, the Hearing Committee stated that "Respondent Luxenberg is on notice that when considering the charges against her, the Hearing Committee may consider evidence presented in connection with the [Harris and O'Brien matters]." Since Ms. Luxenberg's hearing did not begin until March 31, 2014, she had ample and reasonable notice that evidence regarding the administration of her firm that might be presented in the Harris and O'Brien matters might be used in determining violations in the Seltzer matter, and as the Board found, the pertinent evidence introduced "directly related to the charges in the Seltzer matter." Furthermore, in prior cases, we have indicated that the Hearing Committee and the Board should consider such evidence. For example, in *In re Ukwu*, *supra*, we declared that "the Hearing Committee and the Board were required to consider . . . all five representations [of the lawyer] in determining whether [a specified rule] was violated." 926 A.2d at 1117. *See also In re Godette*, 919 A.2d 1157, 1165-66 (D.C. 2007); *In re Shillaire*, 549 A.2d 336, 343 (D.C. 1988), both stating, respectively, that the Board should have considered specified uncharged conduct or

(continued…)

maker, and business-generator, her controlling interest and her husband's low practice profile," all of which "established her as a partner and lawyer with managerial authority in the firm, even if she called her husband 'managing partner.'"

The plain words of Rule 5.1 (a) assign "partners," and lawyers who have "managerial authority in a law firm" the responsibility of making "reasonable efforts to ensure" that the firm's lawyers "conform to the Rules of Professional Conduct." District of Columbia Rules of Professional Conduct, Rule 5.1 (a), and Comment 1. Rule 5.1 (a) of the American Bar Association (ABA) Model Rules of Professional Conduct is virtually the same as the District's Rule 5.1 (a), and Comment 1 to the rule states that "Paragraph (a) applies to lawyers who have managerial authority over the professional work of a firm." However, the comment further specifies that "[t]his includes members of a partnership." ABA Model Rules of Professional Conduct, Rule 5.1 (a), and Comment 1; *see also* Center for Professional Responsibility, ABA, *Annotated Model Rules of Professional Conduct*, 443 (5th ed. 2003).

---

 (…continued)
statements.

Ms. Luxenberg argues that "there are no cases [in this jurisdiction] in which this [c]ourt sanctioned a partner under Rule 5.1 (a) for the actions of **another partner**" (emphasis in original). She maintains that our "cases discussing Rule 5.1 deal exclusively with situations in which the respondent has supervisory control within the firm or over the offending attorney." She specifically cites *In re Robinson*, 74 A.3d 688 (D.C. 2013), a case involving a partner who hired his son-in-law, also an attorney, to supervise the firm's escrow account; this court agreed with the Board's finding that the partner "fail[ed] to ensure firm compliance with the Rules of Professional Conduct" because he ignored warning signs and "was on notice that matters relating to the trust account were awry" due to two overdrafts on the account. *Id*. at 693, 696. Ms. Luxenberg also cites *In re Cohen*, 847 A.2d 1162 (D.C. 2004), but that case involved Rule 5.1 (c)(2) rather than 5.1 (a).

In the factual context of this case, however, we agree with the Board that Rule 5.1 (a) applies to Ms. Luxenberg. The Hearing Committee found that she was the majority owner (52%) of Luxenberg, Johnson & Dickens, and she generally made the decisions as to what clients the firm would represent and who would handle the client matters. Indeed, she identified and introduced Mr. Dickens to

Ms. Seltzer as the firm lawyer who would handle Ms. Seltzer's 2004 request, and later her 2009 request.

Despite Ms. Luxenberg's effort to distance herself from Mr. Dickens with respect to Ms. Seltzer's trusts and estates matter, it is clear that Mr. Dickens considered himself a member of the Luxenberg firm; indeed, he clearly identified himself in the 2009 trust document as "Dorrance D. Dickens, trustee, of Luxenberg, Johnson and Dickens, P.C." Ms. Luxenberg's actions also reflected her belief that Mr. Dickens was still a member of the Luxenberg firm; she sent communications to him at the firm's Virginia satellite office, and continued efforts to reach Mr. Dickens through the administrator of the firm's Virginia office. Moreover, Ms. Luxenberg had made clear to Mr. Dickens in 2009, in writing, that she would continue to be "involved" in the Seltzer matter. In short, the record contains substantial evidence that even though Ms. Luxenberg did not have the title of managing partner, she was a "partner" with "managerial authority" during the time the firm handled Ms. Seltzer's trusts and estates matter; therefore, she fell under the coverage of Rule 5.1 (a).

While the firm had some policies and practices that would assure its lawyers conformed to the Rules of Professional Conduct, Ms. Luxenberg did not make "reasonable efforts" to make certain these policies and procedures actually were in effect and followed. Notably, she took no action when Mr. Dickens began to and continued to miss firm meetings during which firm client matters were reviewed, and despite the firm's policy that all client records should be sent to the firm's main files, she did not make "reasonable efforts" to ensure Mr. Dickens' compliance with the policy after he did not respond to repeated requests for the Seltzer documents, or to Ms. Luxenberg's admonition about the missing documents in a tense phone call around September 2009, prior to the execution of the 2009 trust document.

As we indicated in discussing Rule 1.3 (a), Ms. Luxenberg "was on notice that matters relating to [Ms. Seltzer's] trust . . . were awry." *In re Robinson*, *supra*, 74 A.3d at 696. Ms. Luxenberg may have "assume[d]" that Mr. Dickens would follow the Rules of Professional Conduct, Rule 5.1 (a), Comment 3, but she did not make "reasonable efforts" to ensure that Mr. Dickens' behavior conformed to the Rules of Professional Conduct. Since the firm was very small initially, informal enforcement of policies and procedures and "occasional admonition ordinarily

might be sufficient," Rule 5.1 (a), Comment 3.  However, as we asserted in *In re Robinson*, once warning signs appeared, suggesting clear problems regarding ethical behavior, informal enforcement and occasional admonition no longer sufficed.

Similar conclusions were reached in *Attorney Grievance Comm'n of Maryland v. Kimmel*, 955 A.2d 269 (Md. 2008) and *In re Fonte*, 905 N.Y.S.2d 173 (N.Y. App. Div. 2010).  In *Kimmel*, the founding partners of a Pennsylvania law firm opened a branch office in Maryland and hired a Maryland attorney for the office.  In discussing Maryland Rules 5.1 (a) and 5.1 (b), which are comparable to the District's rules, the court asserted that "[t]he executive attorneys at [the firm] had a responsibility to establish and maintain the new office on solid principles of professional conduct," *id*. at 285, and that to ensure that the firm's lawyers conform to the Rules of Professional Conduct, "partners must establish policies and procedures that, *inter alia*, are designed to . . . identify dates by which actions must be taken in pending matters . . ." *id*. at 284.  *In re Kimmel* also pointed out that periodic review ordinarily is sufficient for a small firm with experienced attorneys, but that "other or different circumstances may indicate the need for 'more elaborate' supervisory measures."  *Id*.  One of the differences is the

"[p]hysical isolation of an attorney from peers," necessitating "a heightened need to adapt supervisory strategies [or periodic review] to ensure compliance with the Rules." *Id*. at 287.

Here, as of 2007, not only was Mr. Dickens in a new office in a jurisdiction where he was not licensed to practice law, Virginia, but he also decreased his attendance at meetings in the firm's Maryland office, a jurisdiction in which he was also not licensed to practice law. He was no longer in the same office with his mentors and partners. Particularly when warning signs appeared that things definitely were not in order with respect to Mr. Dickens' work on the Seltzer trusts and estates matter, as a partner with managerial authority over the Seltzer matter, Ms. Luxenberg should have instituted periodic reviews and intervened to make certain that Mr. Dickens was doing the Seltzer work in a timely manner and was conforming to the Rules of Professional Conduct in his handling of the Seltzer trust assets. As the court said in *In re Fonte*, *supra*, "[i]n the face of . . . warning [signs], [especially of improper handling of trust assets], greater oversight and immediate intervention was warranted." *Id*. at 177. In sum, the record contains substantial evidence to support the Board's finding and conclusion that Ms. Luxenberg violated Rule 5.1 (a).

Second, Ms. Luxenberg contends that "[t]he Board's conclusion [that she violated Rule 5.1 (c)(2)] is incorrect inasmuch as Disciplinary Counsel failed to establish by clear and convincing evidence that [she] had 'comparable managerial authority' over [Mr.] Dickens or that [she] was his direct supervisor in connection with Ms. Seltzer's estate and trusts matter." Disciplinary Counsel argues that "[t]he Board and Committee found that [Ms.] Luxenberg had enough of a supervising role for Rule 5.1 (c)(2) to apply, including 'direct supervisory authority' over [Mr.] Dickens in the Seltzer matter." Disciplinary Counsel maintains that Ms. Luxenberg knew or should have known of Mr. Dickens' misconduct because she "was very much involved in Ms. Seltzer's case, not only as her lawyer, but as a trustee of one of her trusts – a position derived from being Ms. Seltzer's lawyer."

The District's Rule 5.1 (c)(2) differs from that of the ABA Model Rule 5.1 (c)(2) in one noticeable way. The District's rule contains "know or reasonably should know" language while the ABA Model Rule contains only the word "know." Under the District's Rule, there is substantial evidence supporting the Board's conclusion that Ms. Luxenberg "reasonably should [have] know[n] of [Mr.

Dickens'] conduct at a time when its consequences [could have] be[en] avoided but fail[ed] to take reasonable remedial action." Rule 5.1 (c)(2). This court previously rejected a contention that the District's Rule is "unfair" because it "subjects [a lawyer] to discipline for the dishonesty or misrepresentations of another attorney of which the [lawyer] had no knowledge." *In re Cohen*, *supra*, 847 A.2d at 1166. We said that, "as the Board recognized, in going beyond the model rule, Rule 5.1 (c)(2) reflects what this jurisdiction has determined to be a fair and necessary balance. [Rule 5.1 (c)(2)] is not a rule of *imputed liability* for the underlying conduct." *Id.* (emphasis added). However, Comment 4 to Rule 5.1 (c)(2) specifies that "paragraph (c) sets forth general principles of *imputed responsibility* for the misconduct of others," and "[s]ubparagraph (c)(2) extends that responsibility to any lawyer who is a partner or person in comparable managerial authority in the firm in which the misconduct takes place." District of Columbia Rules of Professional Conduct, Rule 5.1 (c)(2), Comment 4. The "reasonably should have known standard" is an "objective" one "based on evaluation of all the facts, including the size and organizational structure of the firm, the lawyer's position, and responsibilities within the firm, the type and frequency of contacts between various lawyers involved, the nature of the misconduct at issue, and the nature of the supervision or other direct responsibility

(if any) actually exercised"; "[t]he mere fact of partnership or a position as a principal in a firm is not sufficient, without more, to satisfy the standard." *Id*., Rule 5.1 (c)(2), Comment 5.

We emphasize that there is no record evidence that Ms. Luxenberg participated in Mr. Dickens' acts of misconduct or had actual knowledge of Mr. Dickens' misappropriation/theft of the Seltzer assets, before his misconduct was discovered—after the fact—by Ms. Shaw and the attorneys for Mr. Seltzer and Ms. Falk. However, Ms. Luxenberg was the main, majority partner in a very small firm with, as of 2007, a central office in Maryland and satellite offices in Virginia and the District of Columbia. The Hearing Committee found that Ms. Luxenberg brought most of the business to the firm, and Ms. Seltzer not only was Ms. Luxenberg's client but Ms. Luxenberg also was the co-trustee of Ms. Seltzer's 1990 trust, as amended in 2004. While Ms. Luxenberg's contacts with Mr. Dickens were frequent when the firm's main office was in the District of Columbia and Mr. Dickens worked out of that office, the contacts were increasingly less frequent after Ms. Luxenberg and Mr. Johnson moved their offices to Maryland and Mr. Dickens chose to work out of the Virginia office. Under these circumstances – and at the first signs that Mr. Dickens was not adhering to firm

policies (including attendance at firm meetings), failed to complete the work on the Seltzer matter in a reasonable time period, failed to send the Seltzer documents to the firm's central files, missed a meeting with Ms. Seltzer, failed to inform Ms. Luxenberg of the new 2009 trust document which implicated the 1990 amended trust of which Ms. Luxenberg was a co-trustee, and failed to inform Ms. Luxenberg of the date of the execution of the 2009 trust or the nature of the letter of instruction that Ms. Luxenberg was asked to witness – Ms. Luxenberg should have become more vigilant in monitoring Mr. Dickens' adherence to the Rules of Professional Conduct. At these warning signs, and others discussed above in our consideration of Ms. Luxenberg's violation of Rule 1.3 (a), "[w]e believe a lawyer of reasonable prudence and competence would have made the inquiry necessary to determine" whether Mr. Dickens was properly handling Ms. Seltzer's trusts and estates matter in a timely fashion. *In re Cohen*, *supra*, 847 A.2d at 1167.

With respect to Ms. Luxenberg's alleged violation of Rules 1.7 (b)(4) and 8.4 (a), Disciplinary Counsel essentially argues that Ms. Luxenberg placed her own interests and those of Mr. Dickens above Ms. Seltzer's interests, repeatedly displayed her unwillingness to challenge Mr. Dickens, and knowingly assisted or aided and abetted Mr. Dickens in his violation of (a) Rule 1.3 (discussed above),

(b) Rule 1.15 (a) and (c) (misappropriation of entrusted funds), and (c) Rule 5.5 (a) (delegated the Seltzer matter to Mr. Dickens while knowing he was not licensed to practice in Maryland). Our review of Disciplinary Counsel's arguments and the voluminous evidence presented in this case convinces us that Ms. Luxenberg violated neither Rule 1.7 (b)(4) nor Rule 8.4 (a).

Rule 1.7 (b) "provides a general description of the types of circumstances in which representation is improper in the absence of informed consent." District of Columbia Rules of Professional Conduct, Rule 1.7 (b), Comment 7. Subparagraph (b)(4) "require[s] disclosure and informed consent in any situation in which the lawyer's representation of a client may be adversely affected by representation of another client" or "by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." *Id*., and Comment 10. The record is devoid of substantial evidence showing that Ms. Luxenberg's representation of Ms. Seltzer was adversely affected by her representation of another client, or that her responsibilities to or interests in Mr. Dickens adversely affected her representation of Ms. Seltzer, or that her own interests adversely affected those of Ms. Seltzer. In fact, the Hearing Committee found no conflict of interest. The gravamen of Disciplinary Counsel's Rule 8.4 (a)

argument against Ms. Luxenberg is that she knowingly assisted or aided and abetted Mr. Dickens in his illegal actions, but just as the record contained no substantial evidence of Ms. Luxenberg's intentional action with respect to Rules 1.3 (b)(1) and (2), the record lacks substantial evidence establishing that Ms. Luxenberg knowingly assisted, aided, or abetted Mr. Dickens' illegal actions. Most significantly, as the Board pointed out, Ms. Luxenberg's credited testimony reveals her steadfast belief that as soon as the 2009 trust became effective, the assets of the 1990 trust were transferred to the 2009 trust.

**What is the Appropriate Sanction for Ms. Luxenberg's Violation of Rules 1.3, 5.1 (a), and 5.1 (c)(2)?**

We are mindful that the Board's recommended six-month sanction comes to us "with a strong presumption in its favor." *In re Silva*, 29 A.3d 924, 926 (D.C. 2011). If the recommended sanction "falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Goffe*, 641 A.2d 458, 463-64 (D.C. 1994). In reviewing the recommended sanction, we consider various non-exclusive factors including "(1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the

conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules[;] (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the conduct." *In re Pelkey*, 962 A.2d 268, 281 (D.C. 2008).

Here, there can be no doubt of the seriousness of Ms. Luxenberg's conduct because her lack of diligence and failure to ensure that Mr. Dickens' behavior conformed to the Rules of Professional Conduct enabled him to siphon away substantial assets of the Seltzer trust belonging to Ms. Luxenberg's longstanding client, Michelle Seltzer. We recognize that Ms. Luxenberg made it quite clear that she did not specialize in trusts and estates but that does not serve as an excuse for failing to carry out her fiduciary duty to Ms. Seltzer as both her lawyer and the co-trustee of the amended 1990 trust. Ms. Luxenberg's violation of Rules 1.3 (a), 5.1 (a), and 5.1 (c)(2) undoubtedly played a role in Mr. Dickens' misappropriation of the Seltzer trust assets that clearly prejudiced Ms. Seltzer who was dedicated to ensuring her children were provided for and protected after her death. However, Ms. Luxenberg was not charged with dishonesty, misrepresentation, or misappropriation. Moreover, Ms. Luxenberg cooperated with Disciplinary

Counsel, has no prior disciplinary history, and was found not to have violated other professional conduct rules. Notably, as the proceedings before the Hearing Committee revealed, and as the Board recognized, Ms. Luxenberg has a "very high reputation in the legal community," and has shown her commitment to public service and to the Bar of the District of Columbia.

Although there is no clear precedent in this jurisdiction for the type of sanction that is appropriate in Ms. Luxenberg's case, under the circumstances discussed in this opinion we do not believe Disciplinary Counsel's advocacy of a one-year suspension with a fitness requirement is appropriate, given the absence of intentional conduct and the lack of substantial evidence that Ms. Luxenberg knowingly assisted or aided and abetted Mr. Dickens' misappropriation. Nor do we think that a simple reprimand as advocated by Ms. Luxenberg, or a 45-day suspension as recommended by the Hearing Committee would reflect the seriousness of Ms. Luxenberg's violations. Rather, in reviewing the sanctions imposed in some of our cases, we believe Ms. Luxenberg's case falls within the range of sanctions imposed in *In re Robinson*, *supra*, which included a violation of Rule 5.1 (a) (as well as Rules 1.15 (a) and (b)), and in *In re Cater*, which included a violation of Rule 5.3 (b) (comparable to Rules 5.1 (a) and (b) but relating to

supervision of a nonlawyer) (as well as Rules 1.1 (a), 8.1 (b), and 8.4 (d)). In *Robinson*, which included a Rule 1.15 (a) violation (negligent misappropriation) we imposed a seven-month suspension, and in *Cater*, which included a Rule 8.4 (d) violation (seriously interfering with the administration of justice), we imposed a 180-day suspension plus a fitness requirement. Consequently, consistent with the presumption in favor of the Board's recommended sanction, we accept the recommendation of the Board that a six-month suspension be imposed without a fitness requirement.[16]

Accordingly, for the foregoing reasons, respondent Deborah Luxenberg is hereby suspended from the practice of law in the District of Columbia for a period of six months, effective 30 days from the date of this opinion. Respondent's attention is called to the requirements of D.C. Bar R. XI, § 14, including the affidavit of compliance.

*So ordered.*

---

[16] This court did not temporarily suspend Ms. Luxenberg pending the outcome of her disciplinary proceeding.