**In re Kenneth M. ROBINSON, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 51706).**

**No. 12–BG–1206.**

District of Columbia Court of Appeals.

Argued March 5, 2013.
Decided Aug. 22, 2013.

W. Gary Kohlman, with whom Jacob A. Stein, Washington, DC, was on the brief, for respondent.

Jennifer P. Lyman, Senior Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Jelani Lowery, Senior Law Clerk, were on the brief, for the Office of Bar Counsel.

Before OBERLY and BECKWITH, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

The Board on Professional Responsibility ("Board") has unanimously recommended that respondent Kenneth M. Robinson be suspended from the practice of law in the District of Columbia for a period of seven months. The Board based this recommended sanction on its conclusion that respondent had violated Rules of Professional Conduct 1.15(a) (negligently misappropriating client funds), 1.15(b) (failing to promptly deliver funds to a client),[1] and 5.1(a) (failure to assure firm compliance with disciplinary rules). The Board's recommended sanction differs from that of the Hearing Committee, which recommended a thirty-day suspension for what it viewed as a "per se" violation of Rule 1.15(a), dealing with misappropriation, and a minimal violation of Rule 1.15(b), dealing with delivery of client funds.[2] Respondent challenges the Board's recommended sanction, urging this court to adopt at most the Hearing Committee's sanction recommendation. Respondent maintains that he reasonably relied on his associate attorney to manage the trust account and therefore he did not engage in negligent misappropriation. In addition, respondent argues that the sanction is "unjust and out of proportion" with other sanctions imposed in comparable cases.[3] Disagreeing with respon-

1. Subsequent to the events at issue here, the notice and prompt payment provision of Rule 1.15(b) was moved to Rule 1.15(c).

2. The Hearing Committee found that respondent had not violated Rule 5.1(a) or (b) by any failure to supervise or assure firm compliance with the Rules.

3. We interpret respondent's brief as challenging the Board's conclusion that he violated Rules 1.15(a) and 5.1(a). Because respondent

dent, we accept the recommended sanction of the Board and impose a seven-month suspension.

## I.

### A.

The basic facts relevant to the matter before us are largely undisputed and may be recounted as follows. Respondent has long been a well-respected member of the District of Columbia Bar, practicing primarily criminal defense. For five years prior to 1999, one of his partners, Nick Hantzes, focused on personal injury work and was responsible for managing the firm's accounts. In mid–1999, respondent hired his son-in-law, Nikolaos Kourtesis. About the same time respondent hired Kourtesis, Hantzes left the firm and respondent delegated responsibility for the daily administration of the firm's trust account to Kourtesis.[4] Kourtesis was at the time a member of the Maryland and New Jersey Bars, and had practiced personal injury law with a law firm in Virginia for two and one-half years prior to joining respondent's firm.[5]

Respondent's firm had both an operating account and a trust account at Riggs Bank. On May 14, 2005, prior to the operative events of this case, Riggs Bank was taken over by PNC Bank, which assigned both accounts new numbers. Kourtesis established protocols for handling settlements and disbursements, and maintained the files for each of the personal injury cases. His responsibilities also included reconciling the trust account and keeping a running balance. However, respondent re-

mained the sole signatory on both accounts and he reviewed the monthly trust account statements as well as canceled checks, confirming his signature, the amounts, payees, and the checks' relation to the firm's business. It was their practice to discuss the case file together whenever Kourtesis presented a check drawn from the trust account to respondent for his signature.

For five years, Kourtesis managed the trust account without incident. But on October 21, 2005, the trust account was overdrawn. On November 22, the trust account was overdrawn again. These overdrafts resulted in the depletion of funds in the trust account belonging to two clients, Ms. Maureane O'Shaugnessy and Ms. Jeri Waddell. To fully elucidate the events leading up to the two overdrafts, we must first describe the representation by respondent of a client in a criminal matter.

In July of 2005, respondent began representing Gerard W. Kiley in connection with criminal charges stemming from an incident where Kiley, a Vietnam War veteran, threw a glass of red wine in the face of the visiting Prime Minister of Vietnam. Respondent negotiated a fee rate with Kiley that provided for a flat fee of $7,500 if the case was resolved at the initial hearing, $15,000 if the case was resolved after the hearing but before trial, and $20,000 if the case proceeded to trial. The initial fee of $7,500 was paid in installments, with each payment deposited in the firm's operating account. By September 29, 2005, it became clear that the case would proceed to trial in October, so respondent requested the second payment of $7,500 per the agreement. In a letter, respondent re-

---

does not challenge the Board's conclusion that he violated Rule 1.15(b), we need not address it here.

4. Both parties, the Hearing Committee, and the Board use "trust account" and "escrow

account" interchangeably. This opinion will use the term trust account.

5. Kourtesis did not become a member of the District of Columbia Bar until December 2005.

minded his client that after the $7,500 payment, he would still owe an additional $5,000 that would be held in escrow until after the trial was completed.

On October 3, respondent received checks of $7,500 and $5,000 from Kiley's supporters. Respondent endorsed the $7,500 check with the notation, "deposit to acct. # * * * * * *0623," the firm's PNC Bank operating account on October 5. That same day, respondent endorsed the $5,000 check to be deposited in the trust account. He signed the check and applied a stamp stating "For Deposit Only Law Office of Kenneth M. Robinson Escrow Account." After respondent endorsed the check, someone wrote the Riggs Bank trust account number (–4609) on the check underneath the image of the stamp.[6] An unknown person prepared the deposit slip, writing the Riggs Bank trust account number in the appropriate box. However, another unknown individual[7] wrote the PNC Bank *operating* account number above the Riggs Bank trust account number on the deposit slip. Thus, the $5,000 intended for

the trust account was deposited in the operating account.

The Kiley case went to trial on October 18 and 19, and resulted in an acquittal. Two days later, respondent asked Kourtesis to draw a $5,000 check from the trust account payable to respondent. Kourtesis did so, noting on the check "Kiley-release funds." Respondent signed, endorsed, and deposited the check into the firm's operating account. Because the Kiley $5,000 check had been mistakenly deposited in the operating account, when respondent's check was presented on October 21, 2005, the trust account became overdrawn by $492.54. At the time, funds of two other clients, Ms. O'Shaugnessy[8] and Ms. Waddell,[9] were included in the existing $4,507.46 balance of the trust account before the overdraft.[10]

PNC Bank alerted respondent about the overdraft on October 21. Respondent, who testified that at the time he had no idea what would have caused the overdraft, immediately deposited $500 in the trust account to cover the overdraft, bringing the balance to $7.46. He instructed

6. Recall that at this time, PNC Bank had taken over Riggs Bank and replaced the Riggs Bank account numbers with new ones.

7. The Hearing Committee Report made clear that no one had identified the individual(s) who prepared the deposit slip.

8. Ms. O'Shaugnessy was one of Kourtesis's personal injury clients. He represented her in connection with a car accident. Kourtesis successfully negotiated a $120,000 settlement in favor of Ms. O'Shaugnessy, which was placed into the firm's trust account. After an initial disbursement, payments to doctors, and several rounds of communication between Ms. O'Shaugnessy and the firm, respondent issued a check to Ms. O'Shaugnessy on October 2, 2005, in the amount of $1,451.03 which represented the remainder of the settlement funds. Ms. O'Shaugnessy did not cash this check until November 25, 2005, when it triggered the second overdraft.

9. Ms. Waddell was one of Kourtesis's personal injury clients. He represented her in an action stemming from a car accident. Kourtesis handled all of the negotiations and settlements, securing a $4,100 settlement for Ms. Waddell, which was deposited in the firm's trust account in April 2005. From that sum, disbursements were made to the Robinson firm, Ms. Waddell, and Ms. Waddell's doctors totaling $3,965. When distributing the award, Kourtesis overlooked the fact that he negotiated a discount from Ms. Waddell's doctors, which resulted in $135 remaining in the trust account. Respondent was not personally involved in representing Ms. Waddell, and testified that he remained unaware she was owed $135 until October 2008, when he sent her the money.

10. The record does not reveal to whom the remaining funds in the trust account prior to the overdraft belonged.

Kourtesis to find out what had happened, and Kourtesis confirmed that he would. At the hearing respondent could not recall if Kourtesis ever reported back to him. One month later, on November 25, the trust account was overdrawn a second time, when Ms. O'Shaugnessy cashed the check for $1,451.03 issued to her by respondent on October 7. See *supra* note 8. PNC Bank honored the check, but again notified respondent of the overdraft. Respondent deposited $1,500 in the account to bring the balance up to $56.43—greater than $0, but still less than the $135 yet to be disbursed to Ms. Waddell. Again, respondent instructed Kourtesis to look into the cause of this overdraft and again, respondent could not recall at the hearing whether Kourtesis ever reported back to him with the results of his investigation. Respondent eventually paid Ms. Waddell the $135.00, some three years later, in October 2008. See *supra* note 9.

## B.

PNC Bank notified Bar Counsel of the overdrafts in July 2006, and Bar Counsel opened its investigation in September 2006. Bar Counsel filed its petition specifying the charges against respondent on August 25, 2009. Before the Hearing Committee, Bar Counsel called two witnesses, Kourtesis and respondent. In its report, the Hearing Committee noted that it found Kourtesis to be "unworthy of belief," while finding respondent's testimony to be "sincere and believable." The Hearing Committee found that respondent violated Rules 1.15(a) and (b) and recommended a suspension of thirty days. The Hearing Committee found that respondent had misappropriated funds owed to two clients, but concluded that this was a "per

se misappropriation, for which [r]espondent was essentially blameless." The Hearing Committee further found that respondent had reasonably relied on Kourtesis when he permitted Kourtesis to manage the firm's trust account and that Bar Counsel failed to prove that respondent had acted recklessly, or even negligently, with regards to the overdraft.[11]

Bar Counsel took exception to the Hearing Committee's report and the parties briefed and argued the matter before the Board. The Board then issued its report and recommended a seven-month suspension based on its conclusion that respondent engaged in negligent misappropriation and that he had violated Rule 5.1(a) in addition to Rule 1.15(a) and (b). The Board's report and recommendation differed from the Hearing Committee's in that it analyzed respondent's behavior both before and after the first overdraft occurred on October 21, 2005. The Board agreed with the Hearing Committee that respondent had acted reasonably prior to the first overdraft, but that his failure to follow up and fully investigate the cause of the overdraft amounted to negligence which resulted in the second overdraft and a continuing misappropriation of his clients' funds. Thus, the Board found that Bar Counsel had proven respondent engaged in negligent misappropriation, which merited a six-month suspension. The Board also concluded that respondent violated Rule 5.1(a) by failing to ensure firm compliance with the Rules of Professional Conduct. In doing so, it relied on essentially the same theory, that after the first overdraft, respondent should have been aware that the accounting practices in place at his firm had failed and that more needed to be done in the supervision of

11. The Hearing Committee focused only on the October overdraft and did not address the November overdraft as a possible misappro-
priation, apparently because Bar Counsel did not so argue before the Hearing Committee.

Kourtesis to ensure compliance with the Rules. For violating Rule 5.1(a), the Board recommended an additional thirty-day suspension.

## II.

■ While this court retains final authority on attorney discipline in the District of Columbia, *In re Shillaire*, 549 A.2d 336, 342 (D.C.1988), we, like the Board itself, must accept the factual findings of the Hearing Committee, unless they are not supported by substantial evidence in the record. *In re Edwards*, 808 A.2d 476, 482 (D.C.2002) (*"Edwards I "*); *In re Micheel*, 610 A.2d 231, 234 (D.C.1992). However, where the question is one of ultimate fact—such as whether an attorney acted recklessly or negligently, we review the issue *de novo*. *In re Romansky*, 938 A.2d 733, 739 (D.C.2007) (citing *In re Carlson*, 802 A.2d 341, 347 (D.C.2002) ("[T]he question of whether Ms. Cafferty recklessly misappropriated client funds is a legal question which we review *de novo*.")).

■ Our jurisprudence has treated with especial rigor the duty of an attorney to handle client funds entrusted to the attorney's care. A client's trust in his lawyer is built on the foundation of "centuries of honesty and faithfulness" in the profession. *In re Addams*, 579 A.2d 190, 193–94 (D.C. 1990) (en banc). Few individual acts can impact the public's trust of the legal system more than an attorney who mishandles the money of a client. *Id.* The seriousness with which we view any violation is evidenced by our unwavering application of the principle that the appropriate sanction for misuse of client funds must be disbarment "unless it appears that the misconduct resulted from nothing more than simple negligence." *Id.* at 191.

With these general considerations in mind, we turn to the case at hand.

### A.

■ We first address the Board's finding that respondent was not negligent with regards to the October 21, 2005, overdraft (disputed by Bar Counsel) and that he was negligent with regard to his actions following the overdraft (disputed by respondent). Rule 1.15(a) provides that a "lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property." The term misappropriation encompasses "any unauthorized use of client's funds entrusted to his or her lawyer," including any "unauthorized temporary use," whether or not the lawyer "derives any personal gain or benefit." *In re Edwards*, 990 A.2d 501, 518 (D.C.2010) (*"Edwards II "*) (citing *In re Anderson*, 778 A.2d 330, 335 (D.C. 2001)). The level of proof is not a demanding one here, for misappropriation occurs whenever "the balance in the [attorney's trust] account falls below the amount due to the client," making misappropriation "essentially a per se offense." *In re Anderson, supra*, 778 A.2d at 335 (citing *In re Micheel, supra*, 610 A.2d at 233).

■ Both the Hearing Committee and the Board agreed that a misappropriation occurred on October 21, 2005. These two bodies also agreed that respondent was not negligent leading up to the October 21 overdraft and resulting misappropriation. We also agree.[12] Prior to the overdraft that triggered Bar Counsel's investigation, respondent relied on Kourtesis to manage the firm's trust account. Both the Hear-

---

**12.** We need not determine whether a non-negligent misappropriation is any violation at all of Rule 1.15(a), or if so, what an appropriate sanction might be, since we agree with the Board that respondent was subsequently negligent.

ing Committee and the Board concluded it was reasonable for respondent to do so. Kourtesis had experience with personal injury law, and understood the mechanics of settlement agreements, trust accounts, and disbursement procedures. Bar Counsel argued that respondent acted negligently by failing to maintain a running balance of the trust account. In response, the Board quite rightly noted that, in this case, maintaining a running balance of the trust account would not have made a difference, because respondent reasonably believed the funds had been deposited in the correct account and the checkbook entry in the firm's running balance would have so indicated.

█ The time period following the initial overdraft is altogether another matter. We agree that respondent acted negligently following the first overdraft,[13] and his negligence left the funds in the trust account depleted such that the misappropriation continued and a second overdraft occurred. Given the importance placed upon the scrupulous care of client funds, the overdraft was a serious wake-up signal to the sole individual with ultimate responsibility for the trust account and a situation that mandated his personal continuing attention. The Board found that respondent's failure to pursue the matter in a more diligent fashion resulted in the second overdraft, which extended the misappropriation.[14]

After the first overdraft, a representative of the bank called respondent and informed him that the trust account had been overdrawn by $492. At the hearing, respondent admitted that at the time of the first overdraft, he well understood that the overdraft would trigger an automatic investigation by the Bar Counsel into his practice. Respondent asked Kourtesis to look into the problem and wrote a check to cover the deficit, but admitted that he never followed up with the matter and essentially washed his hands of the matter. The check barely covered the overdraft and left the trust account in a continuing depleted state. Nearly one month later, the trust account was overdrawn a second time. Respondent again asked Kourtesis to investigate the matter, and wrote a check to cover the deficit. At the hearing, respondent did not recall following up with Kourtesis even on the second overdraft. And again, the check written to cover the overdraft was insufficient to make the trust account whole.[15] In addition, respon-

13. The parties spend considerable time debating whether, upon Bar Counsel's proof of a misappropriation, the burden shifted to respondent to show that he was not negligent, or whether Bar Counsel instead had the further duty to prove simple negligence. We need not address this issue since Bar Counsel in any event proved simple negligence in respondent's failure to act after the first overdraft. Bar Counsel acknowledges that it had the burden to prove any reckless or intentional misappropriation by respondent, and we agree with the Board that the evidence here did not establish misconduct at that level.

14. The Board found fault with respondent for not carefully and promptly reviewing his monthly bank statements, which would have revealed the misapplied deposit after the Oc-

tober 21 overdraft and prior to the November 22 overdraft. Respondent challenges this conclusion, noting that the record is bare of any evidence that bank statements were rendered during that period and, if so, the date of their receipt. It is not unreasonable to think that at some point during the month, the statements would have arrived and should have been immediately examined, given the overdraft. In any event, our conclusion of negligence does not rest on this proposition.

15. *See In re Wendell Robinson,* 583 A.2d 691, 692 (D.C.1990) (disbarring petitioner for misappropriation of funds despite the relatively small amount of money at stake). It appears that, by means not entirely clear, the trust account was finally brought up to the requisite level at the end of January 2006. Re-

dent did not take control of the accounts away from Kourtesis after the second overdraft occurred.

In the end, respondent's argument comes down to his assertion that, just as he justifiably relied on Kourtesis prior to the October 21 overdraft, he reasonably relied on him to investigate the situation and set it aright. This argument also relates to the Rule 5.1 violation, to which we now turn.

## B.

While respondent does not directly contest the Board's recommendation as to the Rule 5.1 violation, he does assert that it was "reasonable" for him to rely on his son-in-law, Kourtesis. Before the Hearing Committee, Bar Counsel argued that respondent violated both Rule 5.1(a) and 5.1(b) by unreasonably relying on what Bar Counsel termed the inexperienced and untrained Kourtesis to manage the firm's escrow account. The Hearing Committee disagreed, relying on *In re Cater*, 887 A.2d 1, 15 (D.C.2005), to support its conclusion that respondent did not violate Rule 5.1(a) or (b). The Hearing Committee found that respondent did have a system in place that provided for "timely review and internal control" of the subordinate lawyers, such as Kourtesis, and that this system had worked well for thirty years. The Hearing Committee also found that respondent fulfilled his own duties with regard to the trust account, as he reviewed the monthly bank statements and canceled checks and was the sole signatory on the account, compliant with this court's man-

date in *In re Cater, supra*, 887 A.2d at 15–16. While acknowledging that respondent's supervision of Kourtesis was not perfect, the Hearing Committee concluded that it was reasonable to entrust Kourtesis with managing the trust account based on his training and experience and the firm's internal review system.

The Board agreed with the Hearing Committee that prior to the first overdraft, Bar Counsel had not shown that respondent's supervision of Kourtesis fell below the standard required by Rule 5.1. However, the Board disagreed with the Hearing Committee's decision to view the adequacy of respondent's supervision "in gross" as opposed to evaluating separately the time before and after the first overdraft. The Board noted that after the overdraft, respondent asked Kourtesis to investigate the root of the problem, but never followed up. Respondent did the same thing after the second overdraft, leaving "the matter solely in Mr. Kourtesis's hands even though he clearly was on notice that something was amiss." In sum, the Board concluded that had respondent met the level of supervision required by Rule 5.1, both the "second overdraft and the continuing misappropriation" could have been avoided.

We agree with the Board that prior to the first overdraft, the system respondent had in place, while perhaps rudimentary, was adequate to address the needs of his law firm. However, after that overdraft, respondent was on notice that matters relating to the trust account were awry. To

spondent's negligence also contributed to his violation of Rule 1.15(b), as the money owed to Ms. Waddell remained unpaid until 2008, three years after the overdraft occurred. Respondent testified that he was unaware that Ms. Waddell was owed any money until Bar Counsel began investigating. He also placed blame on Kourtesis, who apparently misled respondent and Bar Counsel by claiming the Waddell case file had been lost or damaged during a flood at the warehouse. Regardless, respondent remained ultimately responsible for the trust account, and his failure to investigate the root of the misappropriation allowed one of his clients to remain unpaid for three years.

be sure, tasks in any organization need to be delegated, and views can reasonably differ as to the degree to which such delegation is proper and the degree of regular supervision to be provided. But, as already discussed, the area of proper treatment of client funds is a vital one, which respondent in part recognized by retaining complete control over ultimate disbursements. Here, we must agree with the unanimous judgment of respondent's peers on the Board, themselves well versed in the rough and tumble of law practice, that once the alarm bell of an overdraft rang, the matter was too important to be left to a subordinate without at least diligent follow-up of any investigation by the subordinate into the apparent flaw. Regrettably, a conclusion of negligent misappropriation and a violation of Rule 5.1(a) necessarily follow.

### III.

 We turn now to the sanction recommended by the Board. A sanction recommendation from the Board "comes to us with a strong presumption in favor of its imposition." *In re Silva,* 29 A.3d 924, 926–27 (D.C.2011) (internal quotation marks and citation omitted). We adopt the recommended disposition of the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "The rule requires that we enforce a general sense of equality in the sanctions handed out, but it otherwise commands that we should respect the Board's sense of equity in these matters unless that ex-

ercise of judgment proves to be unreasonable." *In re Silva, supra,* 29 A.3d at 927 (quoting *In re Goffe,* 641 A.2d 458, 464 n. 7 (D.C.1994)).

 Respondent argues that the six-month suspension is inconsistent with sanctions imposed in other, non-misappropriation cases. While this may be true, this court has treated misappropriation cases differently: "Simply put, where client funds are involved, a more stringent rule is appropriate." *In re Micheel, supra,* 610 A.2d at 236. A six-month suspension is the norm as a starting point for negligent misappropriation cases. *In re Herbst,* 931 A.2d 1016, 1017 (D.C.2007). *See, e.g., In re Edwards,* 870 A.2d 90, 94 & n. 4 (D.C.2005) (*"Edwards III"*) (citing cases).[16]

Here, the Board considered mitigating factors, such as respondent's "reputation for honesty and integrity, the fact that his clients did not file a complaint, his cooperation with Bar counsel, and his taking ultimate responsibility for the overdraft,' and ... the fact that he is one of the few members of the bar engaged in the practice of street crime defense,'" but concluded that they did not "carry the day when balanced against the misappropriation, the failure to supervise Mr. Kourtesis adequately, the violation of Rule 1.15(b) and the failure to take steps to assure that Mr. Kourtesis was admitted to the D.C. Bar." The situation is unfortunate, but given our standard of deference, we see no basis to reject the Board's carefully considered sanction recommendation.

---

**16.** Respondent argues that the six-month sanction has been applied only in cases where the attorney used the client's money for their own personal expenses. But misappropriation occurs whether or not the attorney derives any personal gain or benefit therefrom. *In re Pleshaw,* 2 A.3d 169, 173 (D.C.2010).

The presence of negligence is the key factor. Respondent urges us to accept the Hearing Committee's recommendation of a one-month sanction, but that was based on a far lesser view of respondent's conduct than that of the Board.

Accordingly, respondent Kenneth M. Robinson is hereby suspended from the practice of law in the District of Columbia for a period of seven months. Respondent's attention is called to the requirements of D.C. Bar R. XI, § 14, including the affidavit of compliance.