*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-811

IN RE JONATHAN C. DAILEY, RESPONDENT.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 448141)

On Report and Recommendation of the
Board of Professional Responsibility
(BDN-71-16)

(Argued November 14, 2019                    Decided July 9, 2020)

*Jonathan C. Dailey*, pro se.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and GREENE, *Senior Judge of the Superior Court of the District of Columbia*.[*]

PER CURIAM: Respondent Jonathan C. Dailey appeals the decision of the Board on Professional Responsibility (the "Board"), which recommended that he be disbarred based on its conclusion that he recklessly misappropriated client funds in violation of Rule 1.15(a) of the District of Columbia Rules of Professional Conduct,

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

in addition to finding that his conduct violated Rules 1.15(c) and (d) and Rule 1.7(b)(4). On appeal, we conclude that respondent committed only negligent misappropriation and, therefore, that the automatic application of disbarment is not warranted. *See, e.g.*, *In re Abbey*, 169 A.3d 865, 876 (D.C. 2017) ("In virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." (cleaned up)). Therefore, we remand to the Board for it to determine the appropriate sanction in light of our conclusion that respondent violated Rules 1.15(a), (c), and (d) and Rule 1.7(b)(4) and that his conduct amounted to negligent misappropriation.

## I.

The Board found that respondent violated paragraphs (a), (c), and (d) of Rule 1.15 ("Safekeeping Property") related to his representation of John Mack and misuse of his trust account, and paragraph (b)(4) of Rule 1.7 ("Conflict of Interest") related to his representation of Tabitha Fitzgerald. In large part, respondent did not take exception to the facts found by the Board, but rather argued that these facts – for the most part – did not evidence Rules violations.[1]

---

[1] The Board declined to find a violation of Rule 1.15 as it related to respondent's conduct in his use of alternative litigation funding because the

## A.    Relevant Factual Background

Respondent became a member of the District of Columbia Bar in 1995 and, prior to the underlying charges, had no disciplinary record.  The relevant facts underlying respondent's representation of Mr. Mack and Ms. Fitzgerald are as follows.

### i.    *Representation of John Mack*

Respondent represented Mr. Mack as successor counsel in a personal injury matter, in which Kaiser Permanente ("Kaiser") informed respondent that it had a claim of $554 for medical services it provided to Mr. Mack.  When the matter settled, respondent put the settlement funds in his trust account.  On June 8, 2010, respondent disbursed payment to Mr. Mack and withheld $1,000, which he deposited in his trust account, to repay Kaiser.  More than nine months later, on March 15, 2011, respondent sought Mr. Mack's permission to repay Kaiser.  However, respondent

---

substantive law relating to alternative litigation financing arrangements was undeveloped and the application of ethical rules to those circumstances raises "weighty policy questions."  Because neither Bar Counsel nor respondent takes exception to that finding, we do not address or disturb it.  *See, e.g.*, *In re Delaney*, 697 A.2d 1212, 1214 (D.C. 1997) (noting that court's review, when neither respondent nor Bar Counsel takes exception to a Board's recommendation, is "especially deferential").

did not write a check to Kaiser until May 6, 2011, and the check did not clear his account until May 23, 2011. During the intervening time, in April and May 2011, the balance of respondent's trust account fell below $554. On May 11, 2011, respondent wrote a check for $2,737.23 from his trust account to pay his office rent. The bank rejected the check due to insufficient funds, causing his balance to go negative on May 12, before returning to $490.12.[2] On May 12, respondent transferred $500 in personal funds to his trust account so that it would have sufficient funds for the check he had made to Kaiser to clear, which occurred on May 23, 2011.

Respondent admits that he mismanaged his trust account and that he did not keep a ledger, accounting records, or similar documentation. Instead, respondent recorded funds in each of his client files with a "disbursement authorization, the settlement agreement, and any other related documents," such as a settlement sheet. Respondent acknowledged that it would be "difficult" to trace client funds from his trust account. The "best way" to do so would be to find the settlement sheet in each client file, determine when the matter settled and disbursements had been made, and then track those transactions in the trust account's bank records. In most instances, it was not possible to determine the amount of client funds in his trust

[2] Before the Ad Hoc Hearing Committee (the "Hearing Committee"), respondent asserted that he mistakenly wrote his office rent check from his trust account, rather than his management account.

account or to compare that amount to the bank records. Respondent admitted that properly maintaining his trust account would have enabled him to maintain sufficient funds to pay Kaiser. Furthermore, respondent kept client records for only three years and not five; he was unaware that the ethics rules required five-year record keeping.

From May 21, 2010 through May 22, 2015, an investigator hired by the Office of Disciplinary Counsel determined that respondent commingled approximately $40,000 in non-client funds with client funds in his trust account. Respondent admitted that he put personal and third-party checks into his trust account. During that period, respondent conducted at least forty-three personal and non-client transactions totaling approximately $100,000 using his trust account.

ii.    *Representation of Tabitha Fitzgerald*

In 1996, respondent purchased a condo unit in Georgetown, which he later sold to a third party with an option to repurchase. In 2007, respondent opted to repurchase the unit but could not qualify for a mortgage. During this time, he was in a romantic relationship with Tabitha Fitzgerald. Respondent and Ms. Fitzgerald agreed that Ms. Fitzgerald would take title to the condo; respondent would live in it; respondent would not pay any rent; and respondent would pay the mortgage

payments, condo fees and assessments, and real estate taxes. In 2010 or early 2011, respondent's relationship with Ms. Fitzgerald ended, and respondent stopped paying the mortgage and condo fees. Ms. Fitzgerald learned about respondent's default when the condo association served her with a foreclosure notice.

In May 2011, the association sued Ms. Fitzgerald in Superior Court to recover unpaid condo assessments and to foreclose on the condo. In that action, respondent agreed to represent Ms. Fitzgerald, and he filed an answer on her behalf. Respondent never informed Ms. Fitzgerald that she had a third-party claim against him based on his prior representations to her that he would make the payments for which she was being sued. Respondent did not inform her of his conflict of interest, did not obtain her informed consent to represent her despite the conflict, and did not make any written disclosures to her about any conflicts.[3] Rather, he advised her, without explaining the consequences, to execute a confessed judgment in favor of the condo association for $17,000 (the original principal amount of the unpaid fees).[4]

---

[3] Respondent "never even thought about" the possibility of a conflict of interest, reasoning that he represented Ms. Fitzgerald so that she did not have to hire another lawyer. In his view, he was attempting to "remedy a problem" he created "without further prejudice to Ms. Fitzgerald."

[4] The terms of the confessed judgment included monthly payment of owed fees and dismissal of the lawsuit. Respondent claims that the confessed judgment was not filed, but held in abeyance.

While respondent represented Ms. Fitzgerald in the association's lawsuit, he separately filed a lawsuit against her, the condo association, and others in August 2013 seeking a declaratory judgment that he was the owner of the condo. Ms. Fitzgerald hired separate counsel, who filed an answer in respondent's litigation denying his allegations and asserting a counterclaim for breach of his agreement to pay the mortgage and condo fees. Later in August 2013, and after consulting with his own attorney, respondent filed a motion to withdraw as counsel for Ms. Fitzgerald in the association's litigation, citing "recent events" as causing a conflict of interest. In November 2013, the court denied without prejudice respondent's motion to withdraw because he had not followed the proper procedure. Despite his acknowledgment of the conflict, respondent appeared as counsel for Ms. Fitzgerald in the association's lawsuit at a status conference in January 2014 to discuss settlement of the case. Respondent did not refile a motion to withdraw until April 2014 (this time following the proper procedure), which the court granted in May 2014. In October 2014, the trial court granted the association leave to pursue a cross-claim against Ms. Fitzgerald in respondent's litigation and dismissed the association's suit against her.[5]

---

[5] In 2015, a jury denied respondent's claim of ownership and awarded Ms. Fitzgerald $176,000 in damages arising from respondent's failure to make the promised payments.

**B.** **Procedural Background**

On November 13, 2016, Disciplinary Counsel served respondent with a Petition Instituting Formal Disciplinary Proceedings and the Specification of Charges, identifying violations of Rules 1.15(a), (c), and (d) and Rule 1.7(b)(4) in connection with the above facts. The Hearing Committee held an evidentiary hearing on August 21 and 22, 2017. On January 29, 2018, the Hearing Committee issued its Report and Recommendation, in which it found by clear and convincing evidence that respondent violated Rules 1.15(a), (c), and (d) in his representation of Mr. Mack; Rule 1.15(a) by commingling personal and entrusted funds in his client trust account and by failing to keep and preserve complete records; and Rule 1.7(b)(4) in his representation of Ms. Fitzgerald. The Hearing Committee recommended disbarment because it found, in part, that respondent recklessly misappropriated funds in his representation of Mr. Mack.

On July 30, 2018, the Board issued its Report and Recommendation, concurring with the Hearing Committee's factual findings, and agreeing that respondent recklessly misappropriated funds in violation of Rule 1.15(a) in the Mack matter and violated Rule 1.7(b)(4) in the Fitzgerald matter. The Board only briefly addressed respondent's violations of Rule 1.15(c) and (d) in relation to his

representation of Mr. Mack, sustaining violations of both, and also noted that respondent did not take exception to the Hearing Committee's findings of commingling and incomplete record-keeping. As a result of its finding that respondent recklessly misappropriated funds in violation of Rule 1.15(a) in representing Mr. Mack, the Board recommended disbarment.[6]

## II.

In cases involving attorney discipline, this court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record," and the Board "is required to accept the factual findings of the hearing committee that are supported by substantial evidence in the record." *In re Abbey*, 169 A.3d at 869 (citation and internal quotation marks omitted). This court reviews the Board's legal conclusions de novo, including the determination of whether an attorney acted recklessly or negligently. *Id.*; *In re Robinson*, 74 A.3d 688, 694 (D.C. 2013) ("[W]here the question is one of ultimate fact—such as whether an attorney acted recklessly or negligently, we review the issue *de novo.*"). We generally defer

---

[6] The Hearing Committee also recommended that respondent be disbarred because it found that he intentionally misappropriated funds in the alternative litigation funding matter. The Board declined to reach the underlying merits of that issue, see *supra* note 1, and its recommended sanction of disbarment did not rely on respondent's conduct in that matter. We do the same.

to the Board's recommended sanction, *see* D.C. Bar Rule XI, § 9(h)(1), although the ultimate responsibility for imposing sanctions rests with this court. *In re Edwards*, 808 A.2d 476, 482 (D.C. 2002); *In re Temple*, 629 A.2d 1203, 1207 (D.C. 1993).

## III.

In reviewing the Board's conclusions, we concur with its finding that respondent violated Rules 1.15(a), (c), and (d) in his representation of Mr. Mack and in his mismanagement of his trust account. We conclude, however, that respondent's misappropriation of Mr. Mack's funds was negligent, rather than reckless. We also agree with the Board's finding that respondent violated Rule 1.7(b)(4) in his representation of Ms. Fitzgerald.

### A. Respondent's Conduct in Representing Mr. Mack Violated Rules 1.15(a), (c), and (d)

By allowing the balance in his trust account to fall below the $554 that Mr. Mack owed to Kaiser and by waiting over eleven months to pay the $554 lien, respondent misappropriated funds in violation of Rules 1.15(a), failed to separate disputed funds in violation of Rule 1.15(d), and failed to promptly deliver owed funds in violation of Rule 1.15(c). We conclude that respondent's system of

maintaining his trust account was inadequate, rather than nonexistent, and find it telling that Disciplinary Counsel's investigation of his account only identified one instance of misappropriation. Thus, while we agree with the Board's conclusions that respondent violated Rules 1.5(a), (c), and (d), for the reasons explained below, we conclude that his misappropriation was negligent, rather than reckless.

i. *Rules 1.15(a) and (d) - Negligent Misappropriation*

Rule 1.15(a) requires that a lawyer hold the property and funds of clients or third parties "separate from the lawyer's own property," and Rule 1.15(d) requires a lawyer to separate property in which multiple parties, to whom the lawyer has an obligation, claim an interest. Misappropriation is "any unauthorized use of client's funds entrusted to a lawyer, including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not she derives any personal gain or benefit therefrom." *In re Edwards*, 808 A.2d at 482 (cleaned up). When a client's funds are deposited into an attorney's account, misappropriation occurs "when the balance in that account falls below the amount due to the client"; proof of improper intent is not required. *Id.* (cleaned up).

The Board concluded, and we agree, that respondent misappropriated funds in the Mack matter. For two months after respondent received permission to repay

Kaiser the lien of $554, the balance in respondent's trust account fell below that amount; only after respondent transferred $500 in personal funds did his trust account have a sufficient balance. Respondent concedes that he misappropriated his client funds and, rather than contest that finding, argues that his conduct amounted to negligence, rather than recklessness.

We agree with respondent that his conduct amounts only to negligence, rather than recklessness as the Board urges us to conclude. "Negligent misappropriation is an attorney's non-intentional, non-deliberate, non-reckless misuse of entrusted funds or an attorney's non-intentional, non-deliberate, non-reckless failure to retain the proper balance of entrusted funds." *In re Abbey*, 169 A.3d at 872. The "hallmarks" of negligent misappropriation include "a good-faith, genuine, or sincere but erroneous belief that entrusted funds have properly been paid; and an honest or inadvertent but mistaken belief that entrusted funds have been properly safeguarded." *Id.* On the other hand, the "hallmarks" of reckless misappropriation include "indiscriminate commingling"; "a complete failure to track settlement proceeds"; "total disregard" of the trust account "resulting in a repeated overdraft condition"; "indiscriminate movement of monies between accounts"; and disregarding "inquiries concerning the status of funds." *Id.* (quoting *In re Ahaghotu*, 75 A.3d 251, 256 (D.C. 2013)).

We find the respondent's conduct here to be similar to the conduct of the respondent involved in *In re Anderson*, 778 A.2d 330 (D.C. 2001), one of our seminal decisions on negligent misappropriation. In *Anderson*, after settling a client's personal injury claim, the attorney disbursed settlement funds to his client, but withheld a portion to repay the client's outstanding medical bills. *Id.* at 333. Subsequently, the funds in the attorney's account fell below the owed amount until, over a year later, the attorney paid the outstanding fee. *Id.* The attorney "kept no separate trust or escrow account nor ledgers or books reflecting receipts and disbursements," but rather "prepared settlement sheets listing required distributions for each case that resulted in a settlement, and made corresponding notations on the case file." *Id.* While we noted that the attorney's "system of documenting client transactions essentially consisted of making notations on case files, preparing a settlement sheet for receipts and disbursements after a settlement, and attempting to make all necessary distributions promptly while keeping record of them 'in [his] head,'" we "rejected the proposition that recklessness can be shown by inadequate record-keeping alone combined with commingling and misappropriation." *Id.* at 339-40. Rather, we concluded that the attorney's conduct amounted only to negligence:

> The aggravating factors beyond poor record-keeping
> which the court has found indicative of recklessness are
> not present in this case: the proof that [the attorney] failed

> to pay a single client obligation is not evidence that he flagrantly disregarded the integrity of third-party funds; he did not indiscriminately write checks on the operating account; and he did not write checks that were dishonored or that caused the account to be in overdraft.

*Id.* at 340.

In determining that respondent's conduct here amounted to merely negligent misappropriation, we reaffirm that Rule 1.15, to support a finding of recklessness, requires more than poor, careless, or non-existent record-keeping in addition to the use of client funds and commingling. *See, e.g.*, *In re Robinson*, 74 A.3d at 695-96 (finding attorney's failure to investigate following overdraft of trust account, leading to second overdraft, amounted to negligent misappropriation); *In re Reed*, 679 A.2d 506, 509 (D.C. 1996) (finding that, despite "practically non-existent and careless" accounting practices – where attorney "did not keep a running balance, her check ledger had no memos, and she did not keep track of the funds" – attorney's withdrawal from escrow account for personal use only amounted to negligent misappropriation); *In re Choroszej*, 624 A.2d 434, 437 (D.C. 1992) ("In Respondent's case, he too was insensitive to his fiduciary responsibilities. He was entrusted with his client's money to pay the client's doctor's bill. Through sloppy bookkeeping, respondent was not alerted to the fact that he never paid this obligation.

From this inadvertent and negligent occurrence, a series of violations ensued." (quoting Board's report)).

Respondent argues that his conduct was merely negligent, given that (1) Kaiser was paid and his client, Mr. Mack, was not harmed, (2) Disciplinary Counsel discovered only one "miscue" of $64, and (3) each payment from his trust account for non-client related expenses was from earned attorneys' fees. On the other hand, Disciplinary Counsel argues that respondent's conduct amounts to recklessness because he had "no system whatsoever" to keep track of client funds and disbursements, "extensively commingled personal funds with client funds for years," had "no records for his trust account," and "overdrew the trust account by paying his office rent from it." Disciplinary Counsel contends that respondent should "get[] no credit for the fact that the Mack misappropriation was the only misappropriation of client or third-party funds that" was found. Rather, Disciplinary Counsel highlights that "the fact that Mr. Mack was not harmed was a matter of serendipity"; had Kaiser attempted to deposit respondent's $554 check on May 11, it would have bounced, making Mr. Mack liable for the unpaid medical bill.

We are not persuaded that respondent's conduct meets the "hallmarks" of reckless misappropriation that we identified in *Abbey*, 169 A.3d at 872. Contrary to

Disciplinary Counsel's argument, respondent did have a system to track client funds (tracking settlements in each client's file, rather than through ledgers or accounting records of the trust account), one that mirrored the system described in *Anderson* that resulted in a finding of negligence. 778 A.2d at 333. As in that case, recklessness cannot be shown by "inadequate record-keeping alone combined with commingling and misappropriation." *Id.* at 339-40. Despite an investigation of respondent's trust account, Disciplinary Counsel was only able to identify one instance of misappropriation and one check that was dishonored. In fact, Disciplinary Counsel rests the entire case of misappropriation on evidence that the amount in respondent's trust account fell below $554 during a single two-month period. The fact that respondent's commingling and poor recordkeeping did not harm any client or third-party appears to be more than "serendipity," as Disciplinary Counsel argues, but rather evidences a lack of additional violations or conduct amounting to recklessness. Additionally, Disciplinary Counsel does not present any evidence to contradict respondent's assertion that paying his office rent from his trust account, and thus the resulting overdraft, was a mistake. We cannot say that respondent's conduct evidences a flagrant disregard for third-party or client funds. While respondent did engage in extensive commingling and had a poor system of recordkeeping, that conduct, combined with one instance of misappropriation, is

insufficient to support a finding of recklessness. Therefore, we conclude that respondent's conduct amounts to negligent misappropriation.

Respondent also violated Rule 1.15(d), which imposes certain obligations on a lawyer with respect to funds in which multiple parties claim an interest, by failing to separate the $554 owed to Kaiser.[7] As of June 8, 2010, respondent withheld $1,000 from Mr. Mack's settlement to repay Kaiser and knew that Kaiser was entitled to $554 of those funds. Prior to Kaiser's receipt of the money on May 23, 2011, the amount in his trust account fell below $554 – demonstrating respondent's own interest in and use of some of that money for reasons other than repayment to Kaiser.[8] Respondent's failure to keep the $1,000, and specifically the $554, separate, despite his own interests and those of Mr. Mack and Kaiser, amounts to a violation of Rule 1.15(d).[9]

---

[7] Rule 1.15(d) requires, in relevant part, that property – "in which interests are claimed by a lawyer and another person, or two or more persons to each of whom the lawyer may have an obligation" – "shall be kept separate [in an account meeting the requirements of Rule 1.15(a) and (b)] by the lawyer until there is an accounting and severance of interests in the property."

[8] For example, on March 31, 2011, Respondent made a wire transfer of $3,500 from his trust account to Ms. Fitzgerald, the reason for which the record does not explain.

[9] The Board bases its conclusion that respondent violated Rule 1.15(d) on respondent's failure to promptly pay Kaiser (in fact, a violation of Rule 1.15(c)),

In sum, we conclude that respondent's conduct with respect to respondent's representation of Mr. Mack amounts to negligent misappropriation. We otherwise concur with the Board's findings that respondent violated Rules 1.5(a) and (d).

ii.   *Rule 1.15(c) - Failure to Make Prompt Payment*

By waiting eleven months to repay Kaiser, respondent violated Rule 1.15(c)'s requirement that he make prompt payment of owed funds. Rule 1.15(c) requires that an attorney, upon receipt of funds in which a third person has an interest, "shall promptly deliver to the . . . third person any funds that the . . . third person is entitled to receive." There is no bright line rule for "prompt" payment, and the Rule's requirement should be evaluated in light of acceptable mitigating circumstances. *See In re Ross*, 658 A.2d 209, 211 (D.C. 1995). Although respondent was aware that Kaiser had a lien for medical services for $554 and received Mr. Mack's settlement check on June 8, 2010, he waited until May 6, 2011 – eleven months later – until he wrote a check to Kaiser for the owed amount. Respondent provided no explanation

while the Hearing Committee appears to rest its Rule violation on respondent's misappropriation. We note that while a charge my represent a compound violation, the Board should address each Rule violation independently, not only to ensure that its analysis is precise, but also to evaluate any potentially separate defense. *See, e.g.*, *In re Smith*, 817 A.2d 196, 201 (D.C. 2003) (recognizing the importance of independently analyzing potential misappropriation and commingling because they are separate violations, even though "the charge presents a compound violation").

or justification for the delay. We therefore conclude that this eleventh-month delay does not constitute prompt payment under the circumstances. *Id.* (finding eleven-month delay with no excuse violated Rule 1.15(c)'s prompt payment requirement).

## B. Respondent's Commingling of Client Funds and Failure to Keep Records Violated Rule 1.15(a)

Beyond the Mack matter, respondent commingled client funds and failed to keep adequate records in violation of Rules 1.15(a). To safeguard clients' funds, Rule 1.15(a) requires a lawyer to hold client funds in a separate trust account and to avoid commingling his clients' funds with his own property. *See In re Ekekwe-Kauffman*, 210 A.3d 775, 792 (D.C. 2019) (per curiam). Commingling constitutes its own violation of Rule 1.15(a). *Id.* Rule 1.15(a) also requires that a lawyer maintain "[c]omplete records" for a period of five years. *See also In re Edwards*, 990 A.2d 501, 522 (D.C. 2010). Respondent admits to mismanagement of his trust account and acknowledges that he used approximately $100,000 from that account to pay third parties, although he asserted that that money was his earned attorney's fees. While this may be true, Rule 1.15(a) requires that an attorney keep his clients' funds and his own funds separate. Moreover, respondent failed to maintain any meaningful records of his trust account for the five-year period 2010 to 2015, violating the record-keeping requirement of Rule 1.15(a). The purpose of

Rule 1.15(a) is to ensure that "the documentary record itself tells the full story of how the attorney handled client or third-party funds," thereby allowing for "a complete audit even if the attorney or client is not available." *Id.* Respondent did not distinguish entrusted and non-entrusted funds, violating the requirements of Rule 1.15(a).

**C.  Respondent Violated Rule 1.7(b)(4) in Representing Ms. Fitzgerald**

Respondent violated Rule 1.7(b)(4) when he represented Ms. Fitzgerald in the condo association's litigation because there was an irreconcilable conflict of interest between that representation and his financial, property, and personal interests. Respondent argues that Ms. Fitzgerald had essentially provided informed consent because she was undoubtedly aware of his interests. But, as explained below, informed consent requires significantly more than an attorney's assumptions about what a client knows. In any event, the representation was non-consentable under Rule 1.7(c)(2) because respondent could not reasonably believe that he could provide competent and diligent representation in light of the conflict.

Rule 1.7(b)(4) provides, in pertinent part, that a lawyer "shall not represent a client with respect to a matter if . . . [t]he lawyer's professional judgment on behalf

of the client will be or reasonably may be adversely affected by the lawyer's . . . own financial, business, property, or personal interests." Rule 1.7(c)(1) authorizes representation under such a circumstance, however, if the client "provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation." *See also In re Hager*, 812 A.2d 904, 913 (D.C. 2002) (noting that consent as outlined in Rule 1.7(c) allows clients "the opportunity to judge and be satisfied that their attorneys [are] providing them wholehearted and zealous representation" (internal quotation marks omitted)). Even with the client's consent, representation is nevertheless prohibited unless the lawyer "reasonably believes" he will be able to provide "competent and diligent representation." Rule 1.7(c)(2).

Respondent's representation of Ms. Fitzgerald was adversely affected by his own financial, property, and personal interests in the condo that was the subject of the association's lawsuit. *See, e.g.*, *In re Robbins*, 192 A.3d 558, 565 (D.C. 2018) (finding conflict of interest when attorney's client used a company, founded by the attorney, to escrow funds and when attorney benefited financially each time his client paid a fee to that company); *In re James*, 452 A.2d 163, 166-67 (D.C. 1982) (finding conflict of interest when attorney failed to make "full disclosure" concerning conflict in a contract in which attorney had a personal interest differing

from that of his clients). In representing Ms. Fitzgerald in the association's litigation, respondent never informed Ms. Fitzgerald that she had a third-party claim against him in that matter (premised on his promise to pay the condo fees for which she was being sued), and he never pled such a claim in that litigation. Instead, respondent urged her to sign a confessed judgment in favor of the condo association. He later filed a lawsuit against her (while still representing her in the association's litigation) seeking a declaratory judgment that he was the actual owner of the unit. Rule 1.7(b)(4) "is designed to assure that the attorney pursues the client's objectives as the client views them, unaffected by any personal interest of the attorney in the outcome." *In re Hager*, 812 A.2d at 914. Here, respondent's own interests – to protect his own financial, property, and personal interest in the condo – adversely affected his professional judgment in representing Ms. Fitzgerald.

Moreover, the record lacks evidence that respondent obtained Ms. Fitzgerald's informed consent. Respondent argues that his only failure was that he failed to "simply tell Ms. Fitzgerald to hire another lawyer – a fact which she knew and appreciated," but he also asks us to assume that informed consent existed because Ms. Fitzgerald, a mortgage broker, should have known that he had an interest in the condo. Rule 1.0(e) defines "informed consent" as "the agreement by a person to a proposed course of conduct after the lawyer has communicated

adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Disclosure of conflicts and obtaining informed consent, however, "are not mere formalities." *In re Szymkowicz*, 195 A.3d 785, 789 (D.C. 2018) (per curiam) (quoting Rule 1.7 cmt. 27). Rule 1.7 requires that an attorney disclose to his client the parties and their interests and positions so "as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation." *Id.* (citing Rule 1.7 cmt. 27). Respondent acknowledges that he never explained to Ms. Fitzgerald the potential claim she had against him. Rather, he testified that he "never even thought about" the possibility of a conflict of interest. There is no evidence to support a finding that respondent obtained Ms. Fitzgerald's informed consent.

Finally, even had there been full disclosure, Ms. Fitzgerald could not have properly waived the conflict. Respondent simply could not have "reasonably believed" that he could provide Ms. Fitzgerald with competent and diligent representation because his own interests were averse to hers as it related to the core issues at the heart of the lawsuit. *See* Rule 1.7(c)(2); Rule 1.7 cmt. 30 ("[I]t is doubtful that a lawyer could hold such a [reasonable] belief . . . where the lawyer's individual interests make it likely that the lawyer will be adversely situated to the

client with respect to the subject matter of the legal representation."). In fact, Ms. Fitzgerald ultimately recovered a judgment on her counterclaim against respondent.

For these reasons, we concur with the Board's finding that respondent violated Rule 1.7(b)(4) in his representation of Ms. Fitzgerald.

**IV.**

The Board recommended that respondent be disbarred based on its finding that respondent's conduct in the Mack matter amounted to reckless misappropriation, and that there was no evidence of extraordinary circumstances warranting a lesser sanction. *See In re Abbey*, 169 A.3d at 876 (quoting *In re Addams*, 579 A.2d 190, 191 (D.C. 1990)). Because we disagree with the Board's conclusion as to recklessness, and find that respondent's conduct amounted only to negligence, we disagree with its conclusion that automatic disbarment is warranted. The Board did not recommend any other sanction that would account for respondent's negligent misappropriation and remaining Rules' violations, and, at oral argument, Disciplinary Counsel was unable to provide a recommended sanction relating to respondent's violation of Rule 1.7(b)(4). Any determination as to the appropriate sanction must consider all the appropriate factors, e.g., seriousness,

prejudice, dishonesty, prior disciplinary history, acknowledgment of wrongdoing, and mitigating and aggravating factors. *See In re Ekekwe-Kauffman*, 210 A.3d at 797. We ordinarily defer to the Board's recommended sanction, unless doing so "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* at 785. Here, the Board recommended only disbarment based solely its finding of reckless misappropriation. Because the Board did not recommend a sanction that balanced respondent's negligent misappropriation with his other Rule violations, and in light of the need to devise such a sanction in light of the above-mentioned factors, the court remands to the Board for reconsideration of a proposed sanction. *See In re Karr*, 722 A.2d 16, 22 (D.C. 1998) (remanding to the Board for reconsideration of proposed sanction in light of court's conclusion that respondent violated five Rules, not the seven the Board found were violated)

Therefore, we remand the disciplinary proceedings to the Board for consideration of a sanction appropriately tailored to respondent's violations of Rules 1.15(a), (c), and (d) and Rule 1.7(b)(4).

*So ordered.*